[L. A. No. 26705.   In Bank.   June 27, 1963.]

JAY R. JACKSON, JR., a Minor, etc., Plaintiff and Appellant, v. PASADENA CITY SCHOOL DISTRICT et al., Defendants and Respondents.

Samuel C. Sheats, Loren Miller and A. L. Wirin for Plaintiff and Appellant.

Stanley Mosk, Attorney General, Robert E. Burke, Deputy Attorney General, and Herbert A. Bernhard as Amici Curiae on behalf of Plaintiff and Appellant.

Harold W. Kennedy, County Counsel, James W. Briggs and Ronald W. Schneider, Deputy County Counsel, for Defendants and Respondents.

GIBSON, C.J.—Jay Jackson, a 13-year-old Negro boy, brought this mandamus proceeding to compel defendants to permit him to transfer from the Washington Junior High School to the Eliot Junior High School. Defendants' demurrer was sustained without leave to amend, and this appeal is from the ensuing judgment. The allegations of the complaint are summarized below.

Prior to July 1961 the Pasadena City School District contained a number of junior high school zones, including Washington, McKinley, and Eliot. The McKinley zone is immediately south of Washington, and Eliot is immediately north of Washington. Extending along the western boundary of the Washington zone and, to a lesser extent, along a portion of the western boundary of the McKinley zone was the Linda Vista Elementary School zone. Because of the withdrawal from the Pasadena district of a junior high school which pupils of the Linda Vista area formerly attended, it became necessary to determine which junior high school they would attend in the Pasadena district. The Linda Vista area is in the main closer to Washington than to any other junior high school in the district. Certain residents of Linda Vista became alarmed at the possibility that pupils from that area, none of whom was a Negro, might be required to attend Washington, which has an enrollment predominantly of Negroes and members of other minority groups. They urged defendant board to assign the Linda Vista pupils to McKinley, which contains a considerably smaller proportion of Negroes, and threatened to seek withdrawal of Linda Vista from the district if this were not done. In July 1961 the board adopted zone

boundaries for junior high schools, and, instead of placing the Linda Vista area in the Washington zone, the board arbitrarily gerrymandered the McKinley zone to include that area. This was done for the purpose of instituting, maintaining, and intensifying racial segregation at Washington, relegating to a single junior high school a substantial proportion of all Negro pupils, and permitting most white pupils to avoid attendance at schools where substantial numbers of Negroes are enrolled. As so established, Washington is a racially segregated school which is inherently inferior to other junior high schools in the district. Plaintiff, who resides in the Washington zone, is required by the board to attend the Washington school, with the result that he is denied equal opportunity for public school education. Plaintiff's request for a transfer to Eliot, which is convenient for him to attend, was denied by the board.

In support of the contention that the complaint does not state a cause of action it is argued that the allegations that Washington is a racially segregated school and that the McKinley zone was gerrymandered to include the Linda Vista area within it are conclusions of law which are not admitted by demurrer. The distinction between ultimate facts and conclusions of law involves at most a matter of degree. The particularity required in pleading facts depends on the extent to which the defendant in fairness needs detailed information that can be conveniently provided by the plaintiff; less particularity is required where the defendant may be assumed to have knowledge of the facts equal to that possessed by the plaintiff. (*Burks* v. *Poppy Construction Co.*, 57 Cal.2d 463, 473-474 [20 Cal.Rptr. 609, 370 P.2d 313].)

The averments with respect to racial segregation and gerrymandering should be treated on general demurrer as allegations of ultimate facts and not mere conclusions of law.

A local board of education has power, in the exercise of reasonable discretion, to establish school attendance zones within the district, to determine the area that a particular school shall serve, and to require the students in that area to attend that school. (Ed. Code, § 984, subd. (a) ; see 29 Ops.Cal.Atty.Gen. 63 (1957) ; Ops.Cal.Atty.Gen. No. 7800 (Nov. 3, 1931).) It is obvious, however, that the general powers of the board with respect to attendance zones are subject to the constitutional guaranties of equal protection and due process.

■ The segregation of school children into separate schools because of their race, even though the physical facilities and the methods and quality of instruction in the several schools may be equal, deprives the children of the minority group of equal opportunities for education and denies them equal protection and due process of the law. (*Brown* v. *Board of Education of Topeka*, 347 U.S. 483, 493-495 [74 S.Ct. 686, 98 L.Ed. 873, 880-881, 38 A.L.R.2d 1180, 1186-1187] ; *Bolling* v. *Sharpe*, 347 U.S. 497, 499-500 [74 S.Ct. 693, 98 L.Ed. 884, 886-887].) ■ In view of the importance of education to society and to the individual child, the opportunity to receive the schooling furnished by the state must be made available to all on an equal basis. Because of intangible considerations relating to the ability to learn and exchange views with other students, segregated professional schools have been held not to provide equal educational opportunities, and such considerations apply with added force to children in grade and high schools. The separation of children from others of similar age and qualifications solely because of race may produce a feeling of inferiority which can never be removed and which has a tendency to retard their motivation to learn and their mental development. (*Brown* v. *Board of Education of Topeka*, 347 U.S. 483, 493-494 [74 S.Ct. 686, 98 L.Ed. 873, 880, 38 A.L.R.2d 1180, 1186-1187].)

■ ·The constitutional rights of children not to be discriminated against in school admission on the grounds of race or color cannot be nullified by state action either openly and directly or indirectly by evasive schemes for segregation, and the Fourteenth Amendment is violated where zoning is merely a subterfuge for producing or perpetuating racial segregation in a school. (*Cooper* v. *Aaron*, 358 U.S. 1, 17 [78 S.Ct. 1401, 3 L.Ed.2d 5, 16] ; *Taylor* v. *Board of Education of City Sch. Dist. of New Rochelle*, 294 F.2d 36, 39 ; *Clemons* v. *Board of Education of Hillsboro*, 228 F.2d 853, 856 et seq.; *Evans* v. *Buchanan*, 207 F.Supp. 820, 824; cf. *Gomillion* v. *Lightfoot*, 364 U.S. 339, 341 et seq. [81 S.Ct. 125, 5 L.Ed.2d 110, 113].) Although in general the federal cases have been concerned with instances of complete or almost complete segregation, it is not decisive that absolute segregation is not present. ■ Improper discrimination may exist notwithstanding attendance by some white children at a predominantly Negro school or attendance by some Negro children at a predominantly white school.

The boundaries of school zones are normally fixed on a neighborhood basis, and where racial imbalance exists in California schools it is usually caused by the fact that the Negro population tends to concentrate in certain areas due to economic factors and discrimination in housing. Thus, some schools may have a disproportionately high percentage of Negro students even though there is no intent by school authorities to discriminate against them. Here, however, it is alleged that the existing imbalance has been intensified by purposeful and unreasonable action on the part of the board. The fact that the gerrymandering of the McKinley zone is not alleged to have changed the physical boundaries of Washington or its racial composition does not mean that the gerrymandering did not constitute discrimination against plaintiff and the other Negro pupils at Washington. ▉ A racial imbalance may be created or intensified in a particular school not only by requiring Negroes to attend it but also by providing different schools for white students who, because of proximity or convenience, would be required to attend it if boundaries were fixed on a nonracial basis.

▉ Although it is alleged that the board was guilty of intentional discriminatory action, it should be pointed out that even in the absence of gerrymandering or other affirmative discriminatory conduct by a school board, a student under some circumstances would be entitled to relief' where, by reason of residential segregation, substantial racial imbalance exists in his school. So long as large numbers of Negroes live in segregated areas, school authorities will be confronted with difficult problems in providing Negro children with the kind of education they are entitled to have. Residential segregation is in itself an evil which tends to frustrate the youth in the area and to cause antisocial attitudes and behavior. Where such segregation exists it is not enough for a school board to refrain from affirmative discriminatory conduct. The harmful influence on the children will be reflected and intensified in the classroom if school attendance is determined on a geographic basis without corrective measures. The right to an equal opportunity for education and the harmful consequences of segregation require that school boards take steps, insofar as reasonably feasible, to alleviate racial imbalance in schools regardless of its cause. Our State Board of Education has adopted regulations which encourage transfers to avoid and eliminate racial segregation (Cal.

Admin. Code, tit. 5, §§ 2010, 2011[1]), and transfers for that purpose are provided for in New York City and elsewhere (see 1961 U.S. Commission on Civil Rights Report, Book 2, Education, pp. 104-107).

School authorities, of course, are not required to attain an exact apportionment of Negroes among the schools, and consideration must be given to the various factors in each case, including the practical necessities of governmental operation. For example, consideration should be given, on the one hand, to the degree of racial imbalance in the particular school and the extent to which it affects the opportunity for education and, on the other hand, to such matters as the difficulty and effectiveness of revising school boundaries so as to eliminate segregation and the availability of other facilities to which students can be transferred.

It follows from what we have said that the demurrer should have been overruled.

The judgment is reversed.

Traynor, J., Schauer, J., McComb, J., Peters, J., Tobriner, J., and Peek, J., concurred.

Respondents' petition for a rehearing was denied July 24, 1963.

---

[1] California Administrative Code, title 5, section 2010, provides: "STATE BOARD POLICY. It is the declared policy of the State Board of Education that persons or agencies responsible for the establishment of school attendance centers or the assignment of pupils thereto shall exert all effort to avoid and eliminate segregation of children on account of race or color."

California Administrative Code, title 5, section 2011, provides: "ESTABLISHMENT OF SCHOOL ATTENDANCE AREAS AND SCHOOL ATTENDANCE PRACTICES IN SCHOOL DISTRICTS. For the purpose of avoiding, insofar as practicable, the establishment of attendance areas and attendance practices which in practical effect discriminate upon an ethnic basis against pupils or their families or which in practical effect tend to establish or maintain segregation on an ethnic basis, the governing board of a school district in establishing attendance areas and attendance practices in the district shall include among the factors considered the following: (a) The ethnic composition of the residents in the immediate area of the school. (b) The ethnic composition of the residents in the territory peripheral to the immediate area of the school. (c) The effect on the ethnic composition of the student body of the school based upon alternate plans for establishing the attendance area or attendance practice. (d) The effect on the ethnic composition of the student body of adjacent schools based upon alternate plans for establishing an attendance area or an attendance practice. (e) The effect on the ethnic composition of the student body of the school and of adjacent schools of the use of transportation presently necessary and provided either by a parent or the district."