[L.A. No. 30484. June 28, 1976.]

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE et al., Plaintiffs and Respondents, v.
SAN BERNARDINO CITY UNIFIED SCHOOL DISTRICT et al., Defendants and Appellants.

## COUNSEL

Bert W. Levit, Allan R. Moltzen and Long & Levit for Defendants and Appellants.

Nathaniel S. Colley and Nancy B. Reardan for Plaintiffs and Respondents.

Robert E. Cartwright, Edward I. Pollock, William H. Lally, Robert G. Beloud, Ned Good, Arne Werchick, David B. Baum, Elmer Low, Sanford M. Gage, Leonard Sacks and Stephen I. Zetterberg as Amici Curiae on behalf of Plaintiffs and Respondents.

## OPINION

**TOBRINER, J.**—In April 1972, the National Association for the Advancement of Colored People (NAACP) and 10 individual minority students instituted this school desegregation class action against the San Bernardino City Unified School District, contending that the school district had failed to meet its constitutional obligations as set forth in this court's decision in *Jackson* v. *Pasadena City School Dist.* (1963) 59 Cal.2d 876 [31 Cal.Rptr. 606, 382 P.2d 878] or its statutory obligations under sections 5002 and 5003 of the Education Code. The trial court conducted a two-stage trial, the initial stage occurring in June 1972 and the second in May 1973; at the latter session a number of experts, appointed by the court to review the school district's current desegregation plan, testified as to their findings. In September 1973, the trial court rendered judgment in favor of plaintiffs, ordering the school district to desegregate its schools by the fall semester of 1974. The school district appeals from that judgment.

For the reasons discussed below, we affirm the trial court's determination that segregation exists within the San Bernardino school district and that the district bears a constitutional obligation to take reasonable and feasible steps to alleviate such segregation. As we have explained in *Crawford* v. *Board of Education, ante,* page 280 [130 Cal.Rptr. 724, 551 P.2d 28], decided this day, school districts in this state bear a constitutional obligation to alleviate segregation in their districts, regardless of the cause of such segregation. The trial court properly refused to relieve the defendant school district of this obligation on the basis of its claim that the segregation in the district was "de facto" rather than "de jure" in nature.

As we also explain, however, while the trial court properly found that the district bears an obligation to take reasonable and feasible steps to desegregate its schools, the court—relying upon statutory and administrative provisions that have since been repealed—utilized an improper "racial balance" standard in determining which schools within the district are unconstitutionally segregated; as in *Crawford,* on remand the trial court must revise its definition of segregation to accord with the guidelines set forth in that case. In addition, because the San Bernardino school board, unlike the Los Angeles school board in *Crawford,* had adopted and implemented a plan for the desegregation of its schools, on remand the court should evaluate the adequacy of such plan in light of the *Crawford* decision before requiring the district to implement an alternative desegregation plan. If, however, the court finds that the district's current desegregation plan is inadequate under *Crawford,* it should order the district to implement a reasonable and feasible plan that promises meaningful progress in the alleviation of segregation in the San Bernardino school district.

We begin our analysis with a brief review of the statistical findings of the trial court relating to the demography of the San Bernardino school district. In the fall of 1972, minority students comprised 37.1 percent of the defendant district's total student population of 34,228; the court found that the racial composition of the district's students was 20.8 percent Spanish surname; 15.5 percent black; 0.6 percent Oriental; 0.2 percent American Indian and 62.9 percent Caucasian. The statistical findings indicate that, unlike the situation described in *Crawford,* over the six-year period from 1966-1972 the number of segregated schools in the San Bernardino school district had substantially declined.

The trial court specifically found that, as of November 1972, there was no racial or ethnic segregation in the district's six senior high schools. At the junior high school level, the findings reveal that whereas in 1966, four of the eight junior highs had either minority or "white" student populations of 95 percent or greater, by 1972 only one of ten junior highs was so severely segregated and all but one of the remaining schools contained between 20 percent and 55 percent minority students.[1] At the elementary school level, similar progress had been made; in 1966, 33 of the district's 42 elementary schools had populations of 85 percent or more minority or white, while in 1972 only 9 of the 42 elementary schools contained such severe racial or ethnic isolation.[2]

Although the parties disagree as to the extent to which the reduction in the number of segregated schools is properly attributable to the efforts of the defendant school board,[3] the record does indicate that over the

---

[1]The following table records the trial court's findings with respect to the racial composition of the district's junior high schools in 1966 and 1972:

| Junior High | Minority % | | Majority % | |
|---|---|---|---|---|
| | 1966 | 1972 | 1966 | 1972 |
| Arrowview | 16 | 46 | 84 | 59 |
| Curtis | — | 31 | — | 69 |
| Del Vallejo | 3 | 31 | 96 | 69 |
| Franklin | 97.6 | 98 | 2.4 | 2 |
| Fremont | 40 | 53 | 60 | 47 |
| Golden Valley | 2.5 | 24 | 97.5 | 76 |
| Highland | 5 | 20 | 95 | 80 |
| Richardson | 72 | 78 | 27 | 22 |
| Serrano | — | 19 | — | 81 |
| Shandin Hills | — | 35 | — | 65 |
| Sturges | 58 | — | 42 | — |
| Anderson TMR | — | 57 | — | 43 |
| Opp. School | — | 43 | — | 57 |

In testifying in regard to the Franklin School, the most seriously segregated junior high school remaining in 1972, the associate superintendent of schools explained that the enrollment of the school had declined from 900 students to approximately 450 students as a result of the district's "controlled open enrollment" transfer program for minorities; the associate superintendent also testified that the predominantly black students (and their parents) who had remained at Franklin had demonstrated great interest in retaining Franklin as "their" school and had opposed all suggestions by the board that the school be closed or moved to a different location.

[2]A table detailing the comparative racial and ethnic composition of the district's elementary schools in 1966 and 1972 is attached as an appendix to this opinion.

[3]At trial, plaintiffs contended that much of the desegregation had occurred "fortuitously" as a natural result of the increase in the city's minority population.

1966-1972 period the San Bernardino school board did undertake a number of steps aimed at alleviating segregation in the district's schools. The principal element of the district's desegregation program over these years was the adoption of a voluntary "controlled open enrollment" transfer option, which afforded minority students who wished to transfer to other schools an opportunity to do so, so long as such transfer improved the racial or ethnic "balance" of either the receiving or sending school;[4] unlike the Los Angeles transfer option discussed in *Crawford, ante,* at pages 288-289, the San Bernardino "controlled open enrollment" plan only permitted transfers which promoted desegregation, precluding all transfers which would lead to resegregation. In addition, unlike the Los Angeles program, the San Bernardino school district provided transportation for students who chose to exercise this option. By virtue of this program several thousand minority students, approximately one-fourth of the minority students assigned to "minority imbalanced" schools, transferred to desegregated schools.[5]

The record also reveals that during this period the district selected the sites of some new schools and closed at least one older school with an eye toward alleviating school segregation. Finally, during these years the district also introduced into its curriculum compensatory programs aimed at alleviating some. of the academic disparity traditionally associated with school segregation and added "minority studies" classes designed to promote improved intergroup relations and to facilitate the desegregation process.

---

[4]Although the plan formally allowed such transfers only on a "space permitting" basis, the district administrators testified that admission had never been denied to a minority applicant on the basis of lack of space.

[5]The following table indicates the number of minority students who exercised the transfer option over the period in question:

| Year | Number of Students |
|---|---|
| 1966-1967 | 219 |
| 1967-1968 | 400 |
| 1968-1969 | 1,490 |
| 1969-1970 | 2,026 |
| 1970-1971 | 1,776 |
| 1971-1972 | 1,554 |
| 1972-1973 | 1,416 |

As the trial court's findings indicate, the decline in the participation in this program in the latter years did not reflect a lessening of the district's commitment to the plan but rather was attributable to "the mandatory assignment of students from [two heavily segregated schools] to less segregated schools while those were under reconstruction."

Although, as noted above, the statistical data does demonstrate that progress had been made in alleviating school segregation between 1966 and 1972, the findings also reveal that the district's efforts had failed to alleviate segregation in a number of junior high and elementary schools located in minority neighborhoods; indeed, in some cases, the degree of racial isolation in such schools increased between 1966 and 1972.[6] This result was perhaps a predictable consequence of the district's desegregation strategy, for while the "controlled open enrollment" program permitted many minority students to transfer out of these heavily segregated schools, such transfers did nothing to alleviate segregation in the nearly all-minority schools which such students left. Throughout the period in question, the school board did not attempt to redraw the geographic boundary zones of the remaining segregated schools, nor did it implement any program under which majority students who lived outside of the minority neighborhoods were assigned to the predominantly minority schools.

Recognizing that its initial desegregation efforts had not eliminated all of the segregation in the district, the San Bernardino school board in June 1971 adopted a resolution directing the superintendent of schools to develop an equitable desegregation plan to end "racial isolation" in the school district; this plan was to be prepared by November 1971, and implementation of the plan was to begin by September 1972 and to be completed by September 1974.[7] Although the district had not previously utilized the "mandatory busing"[8] of students in its desegregation

---

[6]As the tables in footnote 1 and the appendix to this opinion reflect, in 1972 six of the elementary schools and one junior high school had virtually all minority enrollments. All of these schools were located in minority neighborhoods.

[7]The June 1971 resolution read in full: "Be it resolved that an equitable plan to end racial isolation in the San Bernardino Unified School District be drawn up by November 1971 with implementation to begin by September 1972 and to be completed by September 1974."

[8]Although the "mandatory busing" terminology has been frequently utilized in this area, the phrase is in reality a misnomer. In San Bernardino, as in all school districts, no child is actually required to ride a bus to school; a student is free to use any form of transportation he or his parents choose to take him to and from his assigned school. The terminology has come to mean, however, a policy of assigning students to schools beyond walking distance for the purpose of alleviating racial segregation.

As recent statistics of the United States Commission on Civil Rights reveal, the percentage of students who are bused for the purpose of desegregation is a very small portion of the students who ride buses to school for reasons unrelated to desegregation. The figures show that 43.5 percent of the country's school children ride buses to school, but that only 2 to 4 percent of school children are bused for desegregation purposes. (See U.S. Com. on Civ. Rights, Your Child and Busing (1972) p. 7.)

program, the school board instructed the superintendent that the new plan could include the "cross-busing" of students if necessary.[9]

The board's tentative decision to approve a desegregation program which might utilize the mandatory busing of students to eliminate segregation and racial or ethnic imbalance engendered considerable opposition and hostility among many members of the community. Although the task force of school board employees responsible for preparing the details of the full desegregation plan met extensively with community groups in an attempt to enlist their suggestions and their support, community opposition to the mandatory busing aspect of all of the proposed plans continued to be substantial. In the fall of 1971, the board postponed the date for the superintendent's presentation of a proposed desegregation plan until March 16, 1972.

On March 2, 1972, the school board adopted a resolution reaffirming its commitment to "the principles and the ideals of integration," mandating the continuance of all of its programs designed to achieve integration and the promulgation of new educationally oriented programs to facilitate the provision of equal educational opportunities, but specifically declaring that "because of financial limitations it is impossible to support a large scale transportation program necessary to racially balance schools at this time." The resolution directed the superintendent "to limit his integration plan [to be submitted later that month] to those steps which may be taken at this time excluding any proposal for mandatory busing."[10]

---

[9]In this context, "cross-busing" signifies the assignment of minority children to schools in majority neighborhoods and the assignment of majority children to schools in minority neighborhoods.

[10]The March 2, 1972, school board resolution provided in full:

"BE IT RESOLVED that the Board of Education reaffirm its commitment to the principles and the ideals of integration; [¶] BE IT FURTHER RESOLVED that, because of financial limitations it is impossible to support a large scale transportation program necessary to racially balance schools at this time, the Superintendent be instructed to limit his integration plan to those steps which may be taken at this time excluding any proposal for mandatory busing; [¶] BE IT FURTHER RESOLVED that the existing school boundaries and programs designed to achieve integration be maintained, that programs of human relations, integration not requiring involuntary busing, community involvement, inservice training, equal educational opportunity to improve the instructional programs, and other ideas not requiring mandatory busing be provided for the Board's consideration in the March 16 report."

Pursuant to this resolution, the superintendent submitted a proposed desegregation plan which did not include the mandatory busing of children. The proposal, subsequently adopted and implemented by the school board, involved the decentralization of the school district's operations into 10 "planning units." The planning units consisted of groups of elementary schools which would feed into identified junior high schools and then ultimately to a specific high school. The grouping of schools was to be carried out in such a manner that each unit would be composed of approximately the same ethnic and economic distribution as the district as a whole.[11]

While the plan established racially, ethnically and economically diverse planning units, it did not provide that the individual schools within each unit would be immediately desegregated. Rather, the plan called for the creation of "advisory councils" in each of the planning units, composed of school administrators, teachers, and parents, which would "determine priorities and examine programs to voluntarily involve students, staffs and parents in integrated learning experiences." As the trial court found: "The plan envisions voluntary exchanges between students during a limited portion of classroom hours and encourages voluntary participation in extra-curricular activities, and attempts to engage voluntary participation between parents, staff and students, both in planning these activities and setting forth plans for voluntary integration within the planning unit group. It envisages that each planning unit council, composed of parents, teachers and staff, will set reasonable goals for voluntary integration [of each school in the planning unit] within a period of one year."

In April 1972, after the school board had ruled out the implementation of any desegregation plan requiring mandatory busing and had adopted instead the "planning unit" proposal described briefly above, the NAACP, representing minority students attending schools in the defendant district, filed the instant action contending that the school board had failed to meet its constitutional obligation under our *Jackson* decision and had failed to comply with various statutory and administrative regulations relating to the elimination of "racial imbalance" in public schools. The petition for writ of mandate asserted that "it is within the

---

[11]As the board's formal report on the desegregation plan explained: "Each planning unit is composed of three or four predominantly majority schools and one or two predominantly minority schools which are reflective of the different ethnic backgrounds and socio-economic levels of our school district."

power, skill and resources of [the school district] to present an affirmative and effective alleviation or elimination of all racial segregation or imbalance in the schools of said district, but [the district] refuse[s] to do so and will continue to refuse to do so unless ordered otherwise by this Court." The NAACP sought an order requiring the board to formulate and adopt a plan for the complete elimination of racial segregation and racial imbalance in the district's schools which would be put into effect no later than September 1, 1972.

As just noted, the petition for writ of mandate maintained that the school district was obligated not only to alleviate racial segregation in the schools but also to alleviate "racial imbalance." In support of this latter contention, the NAACP relied heavily upon two statutory provisions, Education Code sections 5002 and 5003, which had recently been enacted into law, and upon administrative regulations which had been promulgated by the State Board of Education to implement the statutory provisions.

Prior to the enactment of sections 5002 and 5003 in 1971, regulations adopted by the State Board of Education announced as "the declared policy of the State Board of Education" that all persons responsible for the establishment of school attendance zones or the assignment of pupils to schools "shall exert all efforts to avoid and eliminate *segregation* on account of race or color." (Italics added.) (Cal. Admin. Code, tit. 5, former §§ 2010, 2011.) Section 5002 replaced this administrative policy statement with a legislative declaration of policy directing responsible public officials to "prevent and eliminate *racial and ethnic imbalance* in pupil enrollment" (italics added) and declaring that "[t]he prevention and elimination of such imbalance shall be given high priority in all decisions relating to school sites, school attendance areas, and school attendance practices."[12] Section 5003, in turn, provided, inter alia, that "a racial or ethnic imbalance is indicated in a school if the percentage of pupils of one or more racial or ethnic groups differs significantly from the districtwide percentage." (Ed. Code, § 5003, subd. (c).) Finally, an administrative regulation promulgated under the authority of section

[12]Section 5002 provided in full: "It is the declared policy of the Legislature that persons or agencies responsible for the establishment of school attendance centers or the assignment of pupils thereto shall prevent and eliminate racial and ethnic imbalance in pupil enrollment. The prevention and elimination of such imbalance shall be given high priority in all decisions relating to school sites, school attendance areas, and school attendance practices."

5003, subdivision (e) defined a racially or ethnically imbalanced school more specifically as one in which "the percentage of pupils of one or more racial or ethnic groups differs by more than 15 percentage points from that in all the schools in the district." (Cal. Admin. Code, tit. 5, former § 14021, subd. (c).)

In its return to the petition for writ of mandate, the school district conceded that some of the schools in its district were racially or ethnically imbalanced under the foregoing statutory and administrative provisions, but asserted that any such imbalance was purely de facto in nature and that the district had at all times taken "all measures possible within the limits of the financial resources available to the district" to remedy such imbalance. Under these circumstances, the district claimed that it had complied with all of its constitutional or statutory obligations. The return further alleged that the State Board of Education "is presently drafting rules and regulations for the implementation of [Education Code sections 5002 and 5003]" and that the district "will conform in all respects to the requirements of said sections and of the rules and regulations promulgated thereunder." Finally, the return maintained that plaintiffs should be required to exhaust administrative remedies allegedly available from the State Department of Education and suggested that the court deny relief prior to such exhaustion of remedies.[13]

The initial stage of the trial in this proceeding commenced on June 7, 1972. Plaintiffs introduced evidence relating to the segregated and racially imbalanced nature of a number of the district's schools and to the feasibility of eliminating such segregation and imbalance; several experts also testified to the harm inflicted on minority children by segregated schools. In response, the district's administrators testified to the actions the district had taken over the years to attempt to alleviate segregation and imbalance and to overcome the harmful consequences traditionally associated with school segregation; these administrators also testified to the paucity of financial resources available to the district and to the great expense that would be entailed in a busing program that would achieve racial and ethnic balance in all of the district's schools. Finally, the district administrators defended the "planning unit" concept as an approach aimed at ultimately achieving the elimination of racial

---

[13]The return did not identify what administrative remedies were available, and the trial court subsequently overruled a special demurrer based on the school district's "exhaustion of remedies" theory.

imbalance in the district; the staff explained that they hoped that the communications between parents and students of diverse backgrounds fostered by the integrated activities of the planning unit would break down hostilities and fears among all groups and would ultimately result in the voluntary integration of the individual schools within each unit under the direction of the locally controlled advisory councils.

After hearing this testimony, the trial court entered an initial, interim minute order on June 27, 1972. In its order, the court found that "racial and ethnic imbalance," as defined by the administrative regulation then in effect (Cal. Admin. Code, tit. 5, former § 14021, subd. (c)), existed in several of the district's schools,[14] and that the district had a duty to give high priority to eliminating such imbalance. In light of the expertise of the State Board of Education in interpreting and applying the statutory and administrative requirements in this area, the court determined that the appropriate means to proceed was to order the district "to proceed promptly to prepare and submit to the State Board of Education a plan for the elimination of . . . racial imbalance . . . in the schools of [the] district with a proposed timetable for the implementation of such plan"; the order specified that the plan was to be submitted "as soon as possible . . . and in any event not later than the 1st of September, 1972," and that copies of the plan, and interim progress reports were to be filed with the court. The order envisioned that the State Board of Education would aid the court in determining whether the district's plan complied with the mandate of the governing statutory and administrative provisions.

After obtaining an extension of time for the filing of the desegregation plan from the trial court, the district submitted a desegregation plan to the State Board of Education on October 27, 1972. The plan, as submitted, incorporated the "planning unit" concept described above; while the plan was more detailed than the initial proposal, the principal elements of the plan remained unchanged. Thus, although each planning unit, as a whole, was racially, ethnically and economically balanced, the composition of the student body within each individual school remained unchanged. The plan called for the advisory council of each unit to plan and implement "integrated learning experiences" for the children within

[14]The court's minute order identified only six schools as "imbalanced," but, as pointed out in a later report filed by one of the court-appointed experts, the statistical data, which were uncontradicted, revealed that as of June 1972 there were actually 21 "imbalanced" schools in the district under the administrative regulation's "15 percent deviation" standard.

the unit; such activities were to be offered solely on a voluntary basis.[15] The plan also provided that by March 15, 1973, each advisory council would identify what factors would attract parents in their area voluntarily to enroll their children outside of their neighborhood, and by March 15, 1974, each council would identify acceptable criteria for assigning pupils within planning units; the plan did not, however, establish any date by which concrete proposals were to be put into effect in each planning unit and did not specify a deadline by which the alleviation of racial segregation or racial imbalance in individual schools was actually to be achieved. The report submitted to the State Board of Education on October 27, 1972, indicated that the district had already begun to implement the "planning unit" program described therein.

On November 4, 1972, just one week after the district had submitted its plan to the State Board of Education,the voters of this state passed an initiative measure, designated "Proposition 21," which, inter alia, repealed sections 5002 and 5003 of the Education Code along with all of the implementing administrative regulations. This enactment, of course, raised considerable questions as to the status of the trial court's interim order; the uncertainty was exacerbated by the fact that the constitutionality of Proposition 21 was immediately challenged in a number of pending court actions. In December 1972, the NAACP moved to strike the desegregation plan which had been filed by the school district on October 27, claiming that such plan did not comply with the court's minute order of June 27, 1972. In January 1973, the trial court postponed a ruling on the NAACP motion and appointed four educational experts to review the district's current desegregation plan, to evaluate its effectiveness and to make recommendations as to the future desegregation of the district.

In May 1973, the second stage of the trial in these proceedings took place. A majority of the court-appointed experts testified that the "planning unit" concept was an innovative approach which, in providing a variety of integrated learning experiences and in attempting to involve teachers and parents in the desegregation process, embodied educationally sound principles; the experts all agreed, however, that there were substantial deficiencies in the district's current implementation of the

---

[15]The record contains numerous examples of the "integrated learning experience" actually provided by the various planning units: the "experiences" included art classes, trips to the park, an exchange of recipes and the sharing of culturally identified foods, and visits to local places of interest.

"planning unit" concept. The most fundamental defect that the experts identified was the absence from the district's plan of any definite deadline for the implementation of concrete desegregation measures in each planning unit or for the achievement of actual desegregation in the individual schools of each unit. All the experts expressed serious doubts that the planning unit program, operating on an entirely open-ended voluntary basis, would ever achieve the alleviation of racial imbalance in individual schools within each unit.

In addition, the experts criticized the district for not providing adequate financial support for the planning unit program and for failing to establish an administrative framework to advise and coordinate the activities of the individual planning units; the experts testified that there had been a great disparity in both the quantity and quality of "integrated learning experiences" which had occurred in the various planning units during the initial year of the plan's implementation. Several of the experts reported that numerous members of the planning unit advisory councils had expressed concern that the school board's failure to provide financial support for the planning unit program belied the board's asserted commitment to ensuring the program's success.

One of the expert witnesses also presented an alternative desegregation plan, which did not utilize the "planning unit" approach, but which instead proposed to alleviate the existing segregation and racial and ethnic imbalance in the district by redrawing attendance boundary lines at the junior high school and elementary school levels and by altering the grade structure of various schools. This expert testified that the proposed plan was both reasonable and feasible and would entail significantly less transportation expense than would be incurred in the "planning unit" program.

After receiving this evidence as well as updated statistical data and additional testimony from the district's staff, the trial court rendered its final decision in this matter on September 13, 1973. Although the court made no finding that the district had engaged in de jure segregation or that the facilities or staff in minority schools were unequal to the facilities and staff at other schools, the court did find that a number of the schools in the district were in fact segregated, that the district had placed a "low financial priority at any efforts to achieve integration" and that the district's current, totally voluntary planning unit program "cannot and will not achieve ultimate desegregation."

On the basis of these findings, the court ordered the district to prepare and implement a "reasonable, effective and feasible" desegregation plan. The court did not, however, require the district immediately to reshuffle its pupil assignments for the 1973-1974 school year, but rather permitted the district to continue with its current planning unit approach for another year, so long as the programs were modified to require each student to spend "a sufficient period of time in the other schools within the planning unit group to provide . . . contact with . . . students of other races and ethnic backgrounds . . . [so as to] pave the way for ultimate desegregation in 1974 without the psychological problems arising from an immediate desegregation order."[16] The order specified that starting from the commencement of the 1974 fall semester, any attendance scheme adopted for the assignment of pupils "shall be as free as possible from any segregation. . . ."

■ On appeal, the district primarily contends that in the absence of a finding of either de jùre segregation or of "separate but unequal" schools, the trial court erred in concluding that the district bears a constitutional duty to take affirmative action to alleviate the segregation which may exist in its schools. As we explain at some length in *Crawford, ante,* the district's contention is incorrect; *Jackson* and its progeny establish that in this state all school boards are constitutionally obligated to take reasonable and feasible steps to alleviate segregation in their districts, regardless of the cause of such segregation. Accordingly, we affirm the trial court's conclusion that the San Bernardino school district is constitutionally obligated to undertake reasonable and feasible measures to alleviate the school segregation remaining in the district.

■ Although we sustain the trial court's basic holding, we must also point out, as we have in *Crawford,* that the definition of "segregation" utilized by the trial court is improper and should be modified on remand. In the case at bar, the trial court used a number of alternative formulas in defining "segregation," but all of the formulas identified a "segregated school" on the basis of the school's deviation from a "racial balance" norm;[17] after the trial court's order was filed, our court upheld

---

[16]The order additionally provided that: "There shall be sufficient funds allocated by the District to make this plan effective, and sufficient staff support shall be given to coordinate the planning unit council's efforts so that the set goals [of the planning unit program] can be realistically achieved."

[17]The relevant finding states: "There were three definitions of segregation used throughout the course of the trial: The first one is the definition set forth in Title V,

the constitutionality of the portion of Proposition 21 that repealed the "racial balance" provisions upon which the trial court had relied. (See *Santa Barbara Sch. Dist.* v. *Superior Court* (1975) 13 Cal.3d 315, 328-332 [118 Cal.Rptr. 637, 530 P.2d 605].) In light of this repeal, California school districts bear no statutory obligation to achieve racially balanced schools.

Moreover, as we explain in *Crawford*: "[T]he constitutional mandate articulated in *Jackson* and reaffirmed today is not a constitutional command that each school in a district must reflect the racial composition of the district as a whole . . . . Our decisions, instead, require only that school districts take reasonable and feasible steps to eliminate *segregated* schools, i.e., schools in which the minority student enrollment is so disproportionate as realistically to isolate minority students from other students and thus deprive minority students of an integrated educational experience. . . . It is such segregated schools which traditionally have resulted in the inherently unequal educational opportunities condemned in *Brown*." (*Ante,* at pp. 302-303.)

Although the definition of "segregation" utilized by the trial court is no longer valid, it is evident from the court's specific statistical findings that, as of September 1972, a number of schools in the San Bernardino school district were "segregated" within the meaning of the *Crawford* decision. Thus, in a district whose student population is 62.9 percent Caucasian and 37.1 percent minority, a number of schools had minority enrollments of close to 100 percent. (Cf. *Keyes* v. *School Dist. No. 1, Denver, Colo.* (1973) 413 U.S. 189, 206 [37 L.Ed.2d 548, 562, 93 S.Ct. 2686].) Under *Crawford,* there can be no question but that the district bears a constitutional obligation to take reasonable and feasible steps which promise meaningful progress in the alleviation of segregation in such schools. On remand, the trial court, applying the *Crawford* criteria,

---

Article 3, Section 1421, of the Administration Code, which states as follows: 'For the purpose of these regulations, a racial and ethnic imbalance is indicated in a school if the percentage of pupils of one or more ethnic group composition differs by 15 percentage points from that in all schools of the District.' [¶] The second definition uses the same terminology but substitutes the figure 20% for the figure 15%. The third definition was that definition proposed in the unpublished guidelines suggested for adoption by the State Board under Sections 5002 and 5003 of the Education Code and is as follows: 'For the purpose of these regulations, a racial or ethnic imbalance is indicated in a school if the percentage of pupils of one or more racial or ethnic group differs significantly from the district-wide percentage. A significant difference exists when the school percentage of any racial or ethnic group, including the racial group in the district, is less than one-half or more than double the district-wide percentage of the same group.' "

should identify all the schools in the district to which the board's constitutional duty relates.[18]

In addition, on remand the trial court should also evaluate the adequacy of the district's current desegregation plan in light of the guidelines set out in *Crawford.* ■ As we explain in that decision, "so long as a local school board initiates and implements reasonably feasible steps to alleviate school segregation in its district, and so long as such steps produce meaningful progress in the alleviation of such segregation, and its harmful consequences, we do not believe the judiciary should intervene in the desegregation process." (*Ante*, pp. 305-306.) Moreover, a desegregation plan is not inadequate simply because alternative desegregation techniques may produce more rapid desegregation in the school district. (*Id.*)

In the instant case, of course, the trial court did find that the "planning unit" plan as implemented by the respondent district "cannot and will not achieve ultimate desegregation . . ."; this finding, however, rested in part on a definition of "desegregation" framed in terms of the elimination of racial imbalance. Although from the present record the trial court may well conclude that the district's desegregation plan is similarly inadequate under *Crawford* because it does not promise meaningful progress in the alleviation of *segregated* schools, we believe that the trial court should explicitly resolve this question on remand, with full knowledge of the *Crawford* decision.[19] In evaluating the adequacy of the current desegregation plan under *Crawford,* the trial court may, of course, consider what progress, if any, has been made under the desegregation plan during the pendency of this appeal.

---

[18] In making such a determination, the court should heed our caution in *Crawford* that "in determining whether a particular school is 'segregated' for constitutional purposes, we do not believe set racial or ethnic percentages can be established, either in absolute terms or in terms of the racial composition of a particular district's student population. . . . '[w]hat is or is not a segregated school will necessarily depend on the facts of each particular case. In addition to the racial and ethnic composition of a school's student body, other factors, such as the racial and ethnic composition of faculty and staff[,] and the community and administration attitudes toward the school, must be taken into consideration.' " (*Ante*, at pp. 303-304.)

[19] To avoid possible confusion, we wish to emphasize that a desegregation plan is not invalid simply because it relies upon the voluntary actions of parents and students. As the United States Supreme Court observed in *Green v. County School Board* (1968) 391 U.S. 430, 440 [20 L.Ed.2d 716, 725, 88 S.Ct. 1689]: "Although the general experience under 'freedom of choice' [or similar voluntary plans] to date has been such as to indicate [their] ineffectiveness as tool[s] of desegregation, there may well be instances in which [a

Accordingly, except insofar as it defines "desegregation" with reference to a racial balance concept, the judgment of the trial court is affirmed and the case is remanded for proceedings consistent with this opinion. Plaintiffs shall recover their costs on appeal.

Wright, C. J., McComb, J., Mosk, J., Sullivan, J., Clark, J., and Richardson, J., concurred.

---

APPENDIX

PERCENTAGES OF CHILDREN OF MINORITY AND
MAJORITY ETHNIC BACKGROUNDS

ELEMENTARY SCHOOLS—1972-73 (Minority % Compared with 1966)

| Elementary School | Minority %    |         | Majority % |
|                   | 1966  | 1972-73 | (1972-73)  |
|-------------------|-------|---------|------------|
| Alessandro        | 99.1  | 97      | 3          |
| Arrowhead         | 2.2   | 30      | 70         |
| Barton            | 1.6   | 28      | 72         |
| Belvedere         | .4    | 29      | 71         |
| Bradley           | 12.6  | 36      | 64         |
| Burbank           | 74.1  | 79      | 21         |
| California        | 96.3  | 97      | 3          |
| Cole              | 8.3   | 26      | 74         |
| Cypress           | 10.6  | 24      | 76         |
| Davidson          | 9.8   | 21      | 79         |
| Del Rosa          | 6.3   | 16      | 84         |
| Eliot             | 9.2   | —       | —          |
| Emmerton          | —     | 16      | 84         |
| Fairfax           | 3.8   | 20      | 79         |
| Highland Pacific  | —     | 22      | 78         |
| Hillside          | .9    | 12      | 88         |
| Hunt              | 3.2   | 22      | 78         |
| Kendall           | 1.5   | 24      | 76         |

---

voluntary plan] can serve as an effective device. Where it offers real promise of aiding a desegregation program . . .. there might be no objection to allowing such a device to prove itself in operation." (Fn. omitted.) (See. e.g.. *Hart* v. *Community School Bd. of Ed.. N. Y. Sch. Dist. #21* (1975) 512 F.2d 37, 53-55.) The ultimate test remains whether the desegregation plan produces meaningful progress toward the elimination of segregated schools in the district.

| | | | |
|---|---|---|---|
| Kimbark | — | 43 | 57 |
| Lankershim | — | 34 | 66 |
| Lincoln | 14.0 | 46 | 54 |
| Lytle Creek | 38.5 | 68 | 32 |
| Marshall | .4 | 18 | 82 |
| Mitchell | 1.2 | 14 | 86 |
| Monterey | 17.0 | 35 | 65 |
| Mill | 96.7 | — | — |
| Mt. Vernon | 99.2 | 99 | 1 |
| Muscott | 95.5 | 92 | 8 |
| Muscoy | 38.7 | 58 | 42 |
| Newmark | 1.5 | 16 | 84 |
| North Park | — | 63 | 32 |
| Oehl | — | 9 | 91 |
| Parkside | 1.3 | 12 | 88 |
| Ramona | 98.3 | — | — |
| Riley | 45.6 | 73 | 27 |
| Rio Vista | 97.8 | 99 | 1 |
| Roosevelt | 95.5 | 96 | 4 |
| Sterling | 2.8 | 18 | 82 |
| Thompson | — | 26 | 74 |
| Urbita | 70.3 | 76 | 24 |
| Vermont | 10.4 | 27 | 73 |
| Warm Springs | 5.3 | 23 | 77 |
| Wilson | 5.5 | 19 | 81 |
| *Anderson TMR | — | 57 | 43 |
| *Carmack OH | — | 41 | 59 |

*Special schools for trainable mentally retarded and orthopedically handicapped students.