[No. B033742. Second Dist., Div. Five. Nov. 15, 1990.]

LONG BEACH UNIFIED SCHOOL DISTRICT, Plaintiff and Appellant, v.
THE STATE OF CALIFORNIA et al., Defendants and Appellants;
MARK H. BLOODGOOD, as Auditor-Controller, etc., et al., Defendants and Respondents.

156

158

160

COUNSEL

John K. Van de Kamp, Attorney General, N. Eugene Hill, Assistant Attorney General, Henry G. Ullerich and Martin H. Milas, Deputy Attorneys General, Joseph R. Symkowick and Joanne Lowe for Defendants and Appellants.

De Witt W. Clinton, County Counsel, and Lawrence B. Launer, Assistant County Counsel, for Defendants and Respondents.

Ball, Hunt, Hart, Brown & Baerwitz, Anthony Murray, Allan E. Tebbetts, Agnes H. Mulhearn, Ross & Scott, William D. Ross, Corin L. Kahn and Diana P. Scott for Plaintiff and Appellant.

OPINION

LUCAS, P. J.—

## INTRODUCTION

Long Beach Unified School District (LBUSD) filed a claim with the Board of Control of the State of California (Board), asserting that certain expenditures related to its efforts to alleviate racial and ethnic segregation in its schools had been mandated by the state through regulations (Executive Order) issued by the Department of Education (DOE) and were

reimbursable pursuant to former Revenue and Taxation Code section 2234 and article XIII B, section 6 of the California Constitution. The Board eventually approved the claim and reported to the Legislature its recommendation that funds be appropriated to cover the statewide estimated costs of compliance with the Executive Order. When the Legislature deleted the requested funding from an appropriations bill, LBUSD filed a petition to compel reimbursement (Code Civ. Proc., § 1085) and complaint for declaratory relief. The trial court held that the doctrines of administrative collateral estoppel and waiver prevented the state from challenging the decisions of the Board, and it gave judgment to LBUSD. It also ruled that certain funds previously appropriated by the Legislature were "reasonably available" for reimbursement of the claimed expenditures, subject to audit by the state Controller.

We conclude that the doctrines of collateral estoppel and waiver are inapplicable to the facts of this case. However, we determine as a question of law that the Executive Order requires local school boards to provide a higher level of service than is required either constitutionally or by case law and that the Executive Order is a reimbursable state mandate pursuant to article XIII B, section 6 of the California Constitution. We also decide that former Revenue and Taxation Code section 2234 does not provide for reimbursement of the claim.

Based on uncontradicted evidence, we modify the decision of the trial court regarding which budget line item account numbers provide "reasonably available" funds to reimburse LBUSD for appropriate expenditures under the claim. We further modify the decision to include charging orders against funds appropriated by subsequent budget acts. Finally, we remand the matter to the trial court to determine whether at the time of its order unexpended, unencumbered funds sufficient to satisfy the judgment remained in the approved budget line item account numbers. The trial court must resolve this same issue with respect to the charging order.

## BACKGROUND AND PROCEDURAL HISTORY

The California Property Tax Relief Act of 1972 (Stats. 1972, ch. 1406, § 1, p. 2931) limited the power of local governmental entities to levy property taxes. It also mandated that when the state requires such entities to provide a new program or higher level of service, the state must reimburse those costs. Over time, amendments to the California Constitution and numerous legislative changes impacted both the right and procedure for obtaining reimbursement.

Sometime prior to September 8, 1977, LBUSD, at its option, voluntarily began to incur substantial costs to alleviate the racial and ethnic segregation of students within its jurisdiction.

On or about the above date, DOE adopted certain regulations which added sections 90 through 101 to title 5 of the California Administrative Code, effective September 16, 1977. We refer to these regulations as the Executive Order.

The Executive Order and related guidelines for implementation required in part that school districts which identified one or more schools as either having or being in danger of having segregation of its minority students "shall, no later than January 1, 1979, and each four years thereafter, develop and adopt a reasonably feasible plan for the alleviation and prevention of racial and ethnic segregation of minority students in the district."

On or about June 4, 1982, LBUSD submitted a "test claim" (Claim)[1] to the Board for reimbursement of $9,050,714—the total costs which LBUSD claimed it had incurred during fiscal years 1977-1978 through 1981-1982 for activities required by the Executive Order and guidelines. LBUSD cited former Revenue and Taxation Code section 2234 as authority for the requested reimbursement, asserting that the costs had been "subsequently mandated" by the state.[2]

The Board denied the Claim on the grounds that it had no jurisdiction to accept a claim filed under section 2234. LBUSD petitioned superior court for review of the Board decision. (Code Civ. Proc., § 1094.5.) That court concluded the Board had jurisdiction to accept a section 2234 claim and ordered it to hear the matter on its merits. The Board did not appeal this decision.

On February 16, 1984, the Board conducted a hearing to consider the Claim. LBUSD presented written and oral argument that the Claim was reimbursable pursuant to section 2234 and, in addition, under article XIII B, section 6 of the California Constitution. DOE and the State Department

---

[1] Former Revenue and Taxation Code section 2218 defines "test claim" as "the first claim filed with the State Board of Control alleging that a particular statute or executive order imposes a mandated cost on such local agency or school district." (Stats. 1980, ch. 1256, § 7, p. 4249.)

[2] All statutory references are to the Revenue and Taxation Code unless otherwise stated.
Former section 2234 provided: "If a local agency or a school district, at its option, has been incurring costs which are subsequently mandated by the state, the state shall reimburse the local agency or school district for such costs incurred after the operative date of such mandate." (Stats. 1980, ch. 1256, § 11, pp. 4251-4252.)

of Finance (Finance) participated in the hearing.[3] The Board concluded that the Executive Order constituted a state mandate. On April 26, 1984, the Board adopted parameters and guidelines proposed by LBUSD for reimbursement of the expenditures. No state entity either sought reconsideration of the Board decisions, available pursuant to former section 633.6 of the California Administrative Code,[4] or petitioned for judicial review.[5]

In December 1984, pursuant to former section 2255, the Board reported to the Legislature the number of mandates it had found and the estimated statewide costs of each mandate. With respect to the Executive Order mandate, the Board adopted an estimate by Finance that reimbursement of school districts, including LBUSD, for costs expended in compliance with the Executive Order would total $95 million for fiscal years 1977-1978 through 1984-1985. The Board recommended that the Legislature appropriate that amount.

Effective January 1, 1985, the Commission on State Mandates (Commission) succeeded to the functions of the Board. (Gov. Code, §§ 17525, 17630.)

On March 4, 1985, Assembly Bill No. 1301 was introduced. It included an appropriation of $95 million to the state controller "for payment of claims of school districts seeking reimbursable state-mandated costs incurred pursuant to [the Executive Order] . . . ." On June 27, the Assembly amended the bill by deleting this $95 million appropriation and adding a

---

[3] The DOE recommended that the Claim be denied on the grounds that the requirements of the Executive Order were constitutionally mandated and court ordered and because the Executive Order was effective prior to January 1, 1978 (issues discussed *post*). However, counsel for the DOE expressed dismay that school districts which had voluntarily instituted desegregation programs had been having problems receiving funding from the Legislature, while schools which had been forced to do so had been receiving "substantial amounts of money."

A spokesman from Finance recalled there had been some doubt whether the Board had jurisdiction to hear a 2234 claim. He stated that, assuming the Board did have jurisdiction, the Executive Order contained at least one state mandate, which possibly consisted of administrative kinds of tasks related to the identification of "problem areas and the like."

[4] Former section 633.6 of the California Administrative Code (now renamed California Code of Regulations) provided in relevant part: "(b) Request for Reconsideration. [¶] (1) A request for reconsideration of a Board determination on a specific test claim . . . shall be filed, in writing, with the Board of Control, no later than ten (10) days after any determination regarding the claim by the Board . . . ." (Title 2, Cal. Admin. Code)

[5] Former section 2253.5 provided: "A claimant or the state may commence a proceeding in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure to set aside a decision of the Board of Control on the grounds that the board's decision is not supported by substantial evidence. The court may order the board to hold another hearing regarding such claim and may direct the board on what basis the claim is to receive a rehearing." (Stats. 1978, ch. 794, § 8, p. 2551.)

"finding" that the Executive Order did not impose a state-mandated local program.[6] On September 28, 1985, the Governor approved the bill as amended.

On June 26, 1986, LBUSD petitioned for writ of mandate (Code Civ. Proc., § 1085) and filed a complaint for declaratory relief against defendants State of California; Commission; Finance; DOE; holders of the offices of State Controller and State Treasurer and holder of the office of Auditor-Controller of the County of Los Angeles, and their successors in interest. LBUSD requested issuance of a writ of mandate commanding the respondents to comply with section 2234 (fn. 2, *ante*)[7] and, in an amended petition, its successor, Government Code section 17565, and with California Constitution, article XIII B, section 6.[8] It further requested respondents to reimburse LBUSD $24,164,593 for fiscal years 1977-1978 through 1982-1983, $3,850,276 for fiscal years 1983-1984 and 1984-1985, and accrued interest, for activities mandated by the Executive Order.

The trial court let stand the conclusion of the Board that the Executive Order constituted a reimbursable state mandate and ruled in favor of LBUSD. No party requested a statement of decision.

The judgment stated that the Executive Order constituted a reimbursable state mandate which state entities could not challenge because of the doctrines of administrative collateral estoppel and waiver. It provided that certain previously appropriated funds were " 'reasonably available' " to reimburse LBUSD for its claimed expenditures, applicable interest, and court costs. The judgment also stated that funds denominated the "Fines and Forfeitures Funds," under the custody of the Auditor-Controller of the County of Los Angeles, were not reasonably available. The judgment further decreed that the State Controller retained the right to audit the claims and records of LBUSD to verify the amount of the reimbursement award sum.

---

[6] Former Section 2255 provided in part: "(b) If the Legislature deletes from a local government claims bill funding for a mandate imposed either by legislation or by a regulation . . . , it may take one of the following courses of action: (1) Include a finding that the legislation or regulation does not contain a mandate . . . ." (Stats. 1982, ch. 1638, § 7, p. 6662.)

[7] The language of Government Code section 17565 is nearly identical to that of section 2234 (fn. 2, *ante*), and provides: "If a local agency or a school district, at its option, has been incurring costs which are subsequently mandated by the state, the state shall reimburse the local agency or school district for those costs incurred after the operative date of the mandate." (Stats. 1986, ch. 879, § 10, p. 3043.)

[8] Article XIII B, section 6 provides in pertinent part: "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the state shall provide a subvention of funds to reimburse such local government for the costs of such program or increased level of service . . . ."

State respondents (State) and DOE separately filed timely notices of appeal, and LBUSD cross-appealed.[9]

### DISCUSSION

State asserts that neither the doctrine of collateral estoppel nor the doctrine of waiver is applicable to this case, the costs incurred by LBUSD are not reimbursable, and the remedy authorized by the trial court is inconsistent with California law and invades the province of the Legislature, a violation of article IV, section 4 of the United States Constitution.

The thrust of the DOE appeal is that its budget is not an appropriate source of funding for the reimbursement.

LBUSD has argued in its cross-appeal that an additional source of funding, the "Fines and Forfeiture Funds," should be made available for reimbursement of its costs and, in supplementary briefing, requests this court to order a modification of the judgment to include as "reasonably available funding" specific line item accounts from the 1988-1989 and 1989-1990 state budgets.

### I. State Not Barred From Challenging Decisions of the Board

#### A. Administrative Collateral Estoppel

■ State first contends that the doctrine of administrative collateral estoppel is not applicable to the facts of this case and does not prevent State from litigating whether the Board properly considered the subject claim and whether the claim is reimbursable.

■ Collateral estoppel precludes a party from relitigating in a subsequent action matters previously litigated and determined. (*Teitelbaum Furs, Inc.* v. *Dominion Ins. Co., Ltd.* (1962) 58 Cal.2d 601, 604 [25 Cal.Rptr. 559, 375 P.2d 439].) The traditional elements of collateral estoppel include the requirement that the prior judgment be "final." (*Ibid.*)

■ Finality for the purposes of administrative collateral estoppel may be understood as a two-step process: (1) the decision must be final with

---

[9] Although an "Amended Notice to Prepare Clerk's Transcript" filed by DOE on April 11, 1988, requests the clerk of the superior court to incorporate in the record its notice of appeal filed April 1, 1988, this latter document does not appear in the record before us, and the original apparently is lost within the court system. Respondent LBUSD received a copy of the notice on April 4, 1988.

respect to action by the administrative agency (see Code Civ. Proc., § 1094.5, subd. (a)); and (2) the decision must have conclusive effect (*Sandoval* v. *Superior Court* (1983) 140 Cal.App.3d 932, 936-937 [190 Cal.Rptr. 29]).

A decision attains the requisite administrative finality when the agency has exhausted its jurisdiction and possesses "no further power to reconsider or rehear the claim. [Fn. omitted.]" (*Chas. L. Harney, Inc.* v. *State of California* (1963) 217 Cal.App.2d 77, 98 [31 Cal.Rptr. 524].) ■ In the case at bar, former section 633.6 of the Administrative Code provided a 10-day period during which any party could request reconsideration of any Board determination (fn. 4, *ante*). The Board decided on February 16, 1984, that the Executive Order constituted a state mandate, and on April 26, 1984, it adopted parameters and guidelines for the reimbursement of the claimed expenditures. No party requested reconsideration, no statute or regulation provided for further consideration of the matter by the Board (see, e.g., *Olive Proration etc. Com.* v. *Agri. etc. Com.* (1941) 17 Cal.2d 204, 209 [109 P.2d 918]), and the decisions became administratively final on February 27, 1984, and May 7, 1984, respectively[10] (*Ziganto* v. *Taylor* (1961) 198 Cal.App.2d 603, 607 [18 Cal.Rptr. 229]).

■ Next, the decision must have conclusive effect. (*Sandoval* v. *Superior Court, supra*, 140 Cal.App.3d 932, 936-937.) In other words, the decision must be free from direct attack. (*People* v. *Sims* (1982) 32 Cal.3d 468, 486 [186 Cal.Rptr. 77, 651 P.2d 321].) A direct attack on an administrative decision may be made by appeal to the superior court for review by petition for administrative mandamus. (Code Civ. Proc., § 1094.5.) ■ A decision will not be given collateral estoppel effect if such appeal has been taken or if the time for such appeal has not lapsed. (*Sandoval* v. *Superior Court, supra*, 140 Cal.App.3d at pp. 936-937; *Producers Dairy Delivery Co.* v. *Sentry Ins. Co.* (1986) 41 Cal.3d 903, 911 [226 Cal.Rptr. 558, 718 P.2d 920].) The applicable statute of limitations for such review in the case at bar is three years. (*Carmel Valley Fire Protection Dist.* v. *State of California* (1987) 190 Cal.App.3d 521, 534 [234 Cal.Rptr. 795]; *Green* v. *Obledo* (1981) 29 Cal.3d 126, 141, fn. 10 [172 Cal.Rptr. 206, 624 P.2d 256].) ■ A statute of limitations commences to run at the point where a cause of action accrues and a suit may be maintained thereon. (*Dillon* v. *Board of Pension Comm'rs.* (1941) 18 Cal.2d 427, 430 [116 P.2d 37, 136 A.L.R. 800].)

■ In the instant case, State's causes of action accrued when the Board made the two decisions adverse to State on February 16 and April 26, 1984,

---

[10] We take judicial notice pursuant to Evidence Code section 452, subdivision (h), that February 26, 1984, and May 6, 1984, fall on Sundays.

as discussed. State did not request reconsideration, and the decisions became administratively final on February 27 and May 7, 1984.[11] For purposes of discussion, we will assume the applicable three-year statute of limitations period for the two Board decisions commenced on February 28 and May 8, 1984, and ended on February 28 and May 8, 1987.[12] LBUSD filed its petition for ordinary mandamus (Code Civ. Proc., § 1085) and complaint for declaratory relief on June 26, 1986. At that point, the limitations periods had not run against State and the Board decisions lacked the necessary finality to satisfy that requirement of the doctrine of administrative collateral estoppel.[13]

### B. Waiver

■ State also asserts that the doctrine of waiver is not applicable.

■ A waiver occurs when there is "an existing right; actual or constructive knowledge of its existence; and either an actual intention to relinquish it, or conduct so inconsistent with an intent to enforce the right as to induce

---

[11] We do not address the contention of LBUSD that State failed to exhaust its administrative remedies (*Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 292 [109 P.2d 942, 132 A.L.R. 715]; *Morton* v. *Superior Court* (1970) 9 Cal.App.3d 977, 982 [88 Cal.Rptr. 533]) and therefore State cannot assert its affirmative defenses in response to the petition and complaint of the school district. Traditionally, the doctrine has been raised as a bar only with respect to the party seeking judicial relief, not against the responding party (*ibid.*); we have found no case holding otherwise.

[12] If State had sought reconsideration and its request been denied, or if its request had been granted but the matter again decided in favor of LBUSD, the Board decision would have been final 10 days after the Board action, and at that point the statute would have commenced to run against State.

[13] State argues that its statute of limitations did not commence until the legislation was enacted without the appropriation (Sept. 28, 1985), citing *Carmel Valley Fire Protection Dist.* v. *State of California, supra,* 190 Cal.App.3d at page 548. However, *Carmel Valley* held that the *claimant* does not exhaust its administrative remedies and cannot come under the court's jurisdiction until the legislative process is complete, which occurred in that case when the legislation was enacted without the subject appropriations. At that point, *Carmel Valley* reasoned, the state had breached its duty to reimburse, and the claimant's right of action in traditional mandamus accrued. (*Ibid.*) However, *Carmel Valley* decided, as do we in the case at bar, that the state's statute of limitations commenced on the date the Board made decisions adverse to its interests. (*Id.* at p. 534.)

In addition, we see no reason to permit State to rely on the fortuitous actions of the Legislature, an independent branch of government, to bail it out of obligations established in the distant past by state agents—especially given the lengthy three-year statute of limitations. (Compare, e.g., Gov. Code, § 11523 [mandatory time limit within which to petition for administrative mandamus can be 30 days after last day on which administrative reconsideration can be ordered]; Lab. Code, § 1160.8, and *Jackson & Perkins Co.* v. *Agricultural Labor Relations Board* (1978) 77 Cal.App.3d 830, 834 [144 Cal.Rptr. 166] [30 days from issuance of board order even if party has filed a motion to reconsider].)

a reasonable belief that it has been waived. [Citations.]" (*Carmel Valley Fire Protection Dist.* v. *State of California, supra,* 190 Cal.App.3d at p. 534.) Ordinarily, the issue of waiver is a question of fact which is binding on the appellate court if the determination is supported by substantial evidence. (*Napa Association of Public Employees* v. *County of Napa* (1979) 98 Cal.App.3d 263, 268 [159 Cal.Rptr. 522].) However, the question is one of law when the evidence is not in conflict and is susceptible of only one reasonable inference. (*Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 151-152 [135 Cal.Rptr. 802].)

■ In the instant case, the right to contest the findings of the Board is at issue, and there is no dispute that the state was aware of the existence of this right. As discussed, the statute of limitations had not run when State raised its affirmative defenses, and during this time State could have filed a separate petition for administrative mandamus. ■ ■ ■ ■ ■ State's assertion of its affirmative defenses during this period is inconsistent with an intent to waive its right to contest the Board decisions, and therefore the doctrine of waiver is not applicable.[14]

## II. Issue of State Mandate

■ Ordinarily, our conclusion that the trial court erred in failing to consider the merits of the State's challenge to the decisions of the Board would require that the matter be remanded to the trial court for a full hearing. However, because the question of whether a cost is state mandated is one of law in the instant case (cf. *Carmel Valley Fire Protection Dist.* v. *State of California, supra,* 190 Cal.App.3d at p. 536), we now decide that the expenditures are reimbursable pursuant to article XIII B, section 6 of the California Constitution and that no relief is available under section 2234.[15]

---

[14] LBUSD contends that State should be equitably estopped from challenging the Board decisions. In the absence of a confidential relationship, the doctrine of equitable estoppel is inapplicable where there is a mistake of law. (*Gilbert* v. *City of Martinez* (1957) 152 Cal.App.2d 374, 378 [313 P.2d 139]; *People* v. *Stuyvesant Ins. Co.* (1968) 261 Cal.App.2d 773, 784 [68 Cal.Rptr. 389].) There is no confidential relationship herein, and since we conclude as a matter of law and contrary to the trial court that the statute of limitations does not bar State from litigating the mandate and reimbursability issues, the doctrine is inapplicable.

[15] We invited State, DOE, and LBUSD to submit additional briefing on the following issues: "1. Can it be determined as a question of law whether sections 90 through 101 of Title 5 of the California Administrative Code [Executive Order] constitute a state mandate within the meaning of article XIII B, section 6 of the California Constitution? 2. Do the above sections constitute such mandate?" State and LBUSD submitted additional argument; DOE declined the invitation.

## A. Recovery Under Article XIII B, Section 6

On November 6, 1979, California voters passed initiative measure Proposition 4, which added article XIII B to the state Constitution. This measure, a corollary to the previously passed Proposition 13 (art. XIII A, which restricts governmental taxing authority), placed limits on the growth of state and local government appropriations. It also provided reimbursement to local governments for the costs of complying with certain requirements mandated by the state. LBUSD argues that section 6 of this provision is an additional ground for reimbursement.

### 1. The Executive Order Requires a Higher Level of Service

In relevant part article XIII B, section 6 (Section 6) provides: "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the state shall provide a subvention of funds to reimburse such local government for the costs of such program or increased level of service . . . ." The subvention requirement of Section 6 "is directed to state mandated increases in the services provided by local agencies in existing 'programs.' " (*County of Los Angeles* v. *State of California* (1987) 43 Cal.3d 46, 56 [233 Cal.Rptr. 38, 729 P.2d 202].) "[T]he drafters and the electorate had in mind the commonly understood meanings of the term—programs that carry out the governmental function of providing services to the public, or laws which, to implement a state policy, impose unique requirements on local governments and do not apply generally to all residents and entities in the state." (*Ibid.*)

In the instant case, although numerous private schools exist, education in our society is considered to be a peculiarly governmental function. (Cf. *Carmel Valley Fire Protection Dist.* v. *State of California, supra*, 190 Cal.App.3d at p. 537.) Further, public education is administered by local agencies to provide service to the public. Thus public education constitutes a "program" within the meaning of Section 6.

State argues that the Executive Order does not mandate a higher level of service—or a new program—because school districts in California have a constitutional duty to make an effort to eliminate racial segregation in the public schools. In support of its argument, State cites *Brown* v. *Board of Education* (1952) 347 U.S. 483, 495 [98 L.Ed. 873, 881, 74 S.Ct. 686, 38 A.L.R.2d 1180]; *Jackson* v. *Pasadena City School District* (1963) 59 Cal.2d 876, 881 [31 Cal.Rptr. 606, 382 P.2d 878]; *Crawford* v. *Board of Education* (1976) 17 Cal.3d 280 [130 Cal.Rptr. 724, 551 P.2d 28] and cases cited therein; and *National Assn. for Advancement of Colored People* v. *San Ber-*

*nardino City Unified Sch. Dist.* (1976) 17 Cal.3d 311 [130 Cal.Rptr. 744, 551 P.2d 48]. These cases show that school districts do indeed have a constitutional obligation to alleviate racial segregation, and on this ground the Executive Order does not constitute a "new program." However, although school districts are required to " 'take steps, insofar as reasonably feasible, to alleviate racial imbalance in schools regardless of its cause[]' " (*Crawford, supra,* at p. 305, italics omitted, citing *Jackson*), the courts have been wary of requiring specific steps in advance of a demonstrated need for intervention (*Crawford,* at pp. 305-306; *Jackson, supra,* at pp. 881-882; *Swann* v. *Board of Education* (1971) 402 U.S. 1, 18-21 [28 L.Ed.2d 554, 567-570, 91 S.Ct. 1267]). On the other hand, courts have required specific factors be considered in determining whether a school is segregated (*Keyes* v. *School District No. 1, Denver, Colo.* (1973) 413 U.S. 189, 202-203 [37 L.Ed.2d 548, 559-560, 93 S.Ct. 2686]; *Jackson, supra,* at p. 882).

The phrase "higher level of service" is not defined in article XIII B or in the ballot materials. (*County of Los Angeles* v. *State of California, supra,* 43 Cal.3d 46, 50.) A mere increase in the cost of providing a service which is the result of a requirement mandated by the state is not tantamount to a higher level of service. (*Id.,* at pp. 54-56.) However, a review of the Executive Order and guidelines shows that a higher level of service is mandated because their requirements go beyond constitutional and case law requirements. Where courts have *suggested* that certain steps and approaches may be helpful, the Executive Order and guidelines *require* specific actions. For example, school districts are to conduct mandatory biennial racial and ethnic surveys, develop a "reasonably feasible" plan every four years to alleviate and prevent segregation, include certain specific elements in each plan, and take mandatory steps to involve the community, including public hearings which have been advertised in a specific manner. While all these steps fit within the "reasonably feasible" description of *Jackson* and *Crawford*, the point is that these steps are no longer merely being suggested as options which the local school district may wish to consider but are required acts. These requirements constitute a higher level of service. We are supported in our conclusion by the report of the Board to the Legislature regarding its decision that the Claim is reimbursable: "[O]nly those costs that are above and beyond the regular level of service for like pupils in the district are reimbursable."

## 2. *The Executive Order Constitutes a State Mandate*

For the sake of clarity we quote Section 6 in full: "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the state shall provide a subvention of funds to

reimburse such local government for the costs of such program or increased level of service, except that the Legislature may, but need not, provide such subvention of funds for the following mandates: [¶] (a) Legislative mandates requested by the local agency affected; [¶] (b) Legislation defining a new crime or changing an existing definition of a crime; or [¶] *(c) Legislative mandates enacted prior to January 1, 1975, or executive orders or regulations initially implementing legislation enacted prior to January 1, 1975."* (Italics added.) This amendment became effective July 1, 1980. (Art. XIII B, § 10.) Again, the Executive Order became effective September 16, 1977.

State argues there is no constitutional ground for reimbursement because (a) with reference to the language of exception (c) of Section 6, the Executive Order is neither a statute nor an executive order or regulation implementing a statute; (b) recent legislation limits reimbursement to certain costs incurred after July 1, 1980, the effective date of the constitutional amendment; and (c) LBUSD failed to exhaust administrative procedures for reimbursement of Section 6 claims (Gov. Code, § 17500 et seq.). We conclude that recovery is available under Section 6.

### (a) *Form of Mandate*

State argues the Executive Order is not a state mandate because, with reference to exception (c) of Section 6, it is neither a statute nor an executive order implementing a statute.

■■ In construing the meaning of Section 6, we must determine the intent of the voters by first looking to the language itself (*County of Los Angeles* v. *State of California, supra,* 43 Cal.3d 46, 56), which " 'should be construed in accordance with the natural and ordinary meaning of its words.' [Citation.]" (*ITT World Communications, Inc.* v. *City and County of San Francisco* (1985) 37 Cal.3d 859, 865 [210 Cal.Rptr. 226, 693 P.2d 811].) The main provision of Section 6 states that whenever the Legislature or any state agency "mandates" a new program or higher level of service, the state must provide reimbursement. ■■ We understand the use of "mandates" in the ordinary sense of "orders" or "commands," concepts broad enough to include executive orders as well as statutes. As has been noted, "[t]he concern which prompted the inclusion of section 6 in article XIII B was the perceived attempt by the state to enact legislation *or adopt administrative orders* creating programs to be administered by local agencies, thereby transferring to those agencies the fiscal responsibility for providing services which the state believed should be extended to the public." (*County of Los Angeles* v. *State of California, supra,* 43 Cal.3d at p. 56.) It is clear that the primary concern of the voters was the increased financial

burdens being shifted to local government, not the form in which those burdens appeared.

We derive support for our interpretation by reference to the ballot summary presented to the electorate. (Cf. *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245-246 [149 Cal.Rptr. 239, 583 P.2d 1281].) The legislative analyst determined that the amendment would limit the rate of growth of governmental appropriations, require the return of taxes which exceeded amounts appropriated, and "[r]equire the state to reimburse local governments for the costs of complying with 'state mandates.'" The term "state mandates" was defined as "requirements imposed on local governments by legislation *or executive orders.*" (Italics added; Ballot Pamp., Proposed Amend. to Cal. Const. with arguments to voters, Special Statewide Elec. (Nov. 6, 1979) p. 16.)

■ Although exception (c) of Section 6 gives the state discretion whether to reimburse pre-1975 mandates which are either statutes or executive orders implementing statutes, we do not infer from this exception that reimbursability is otherwise dependent on the form of the mandate. We conclude that since the voters provided for mandatory reimbursement except for the three narrowly drawn exceptions found in (a), (b), and (c), there was no intent to exclude recovery for state mandates in the form of executive orders. Further, as State sets forth in its brief, the adoption of the Executive Order was "arguably prompted" by the decision in *Crawford* v. *Board of Education, supra,* 17 Cal.3d 280, a case decided after the 1975 cutoff date of exception (c). Since case law and statutory law are of equal force, there appears to be no basis on which to exclude executive orders which implement case law or constitutional law while permitting reimbursement for executive orders implementing statutes. We see no relationship between the proposed distinction and the described purposes of the amendment (*County Los Angeles* v. *State of California, supra,* 43 Cal.3d at p. 56; *County of Los Angeles* v. *Department of Industrial Relations* (1989) 214 Cal.App.3d 1538, 1545 [263 Cal.Rptr. 351]).

(b) *Recent Legislative Limits*

State contends that LBUSD cannot claim reimbursement under Section 6 because Government Code sections 17561 (Stats. 1986, ch. 879, § 6, p. 3041) and 17514 (Stats. 1984, ch. 1459, § 1, p. 5114) limit such recovery to mandates created by statutes or executive orders implementing statutes, and only for costs incurred after July 1, 1980.

As discussed above, the voters did not intend to limit reimbursement of costs only to those incurred pursuant to statutes or executive orders imple-

menting statutes except as set forth in exception (c) of Section 6. We presume that when the Legislature passed Government Code sections 17561 and 17514 it was aware of Section 6 as a related law and intended to maintain a consistent body of rules. (*Fuentes* v. *Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 1, 7 [128 Cal.Rptr. 673, 547 P.2d 449].) As discussed above, the limitations suggested by State are confined to exception (c).

Further, the state must reimburse costs incurred pursuant to mandates enacted after January 1, 1975, although actual payments for reimbursement were not required to be made prior to July 1, 1980, the effective date of Section 6. (*Carmel Valley Fire Protection Dist.* v. *State of California, supra,* 190 Cal.App.3d at pp. 547-548; *City of Sacramento* v. *State of California* (1984) 156 Cal.App.3d 182, 191-194 [203 Cal.Rptr. 258], disapproved on other grounds in *County of Los Angeles* v. *State of California, supra,* 43 Cal.3d at p. 58, fn. 10.)

### (c) *Administrative Procedures*

The Legislature passed Government Code section 17500 et seq. (Stats. 1984, ch. 1459, § 1, p. 5113), effective January 1, 1985 (Stats. 1984, ch. 1459, § 1, p. 5123), to aid the implementation of Section 6 and to consolidate the procedures for reimbursement under statutes found in the Revenue and Taxation Code. This legislation created the Commission, which replaced the Board, and instituted a number of procedural changes. (Gov. Code, §§ 17525, 17527, subd. (g), 17550 et seq.) The Legislature intended the new system to provide "the sole and exclusive procedure by which a local agency or school district" could claim reimbursement. (Gov. Code, § 17552.) State argues that since LBUSD never made its claim before the Commission, it failed to exhaust its administrative remedies and cannot now receive reimbursement under section 6.

As discussed, the Board decisions favorable to LBUSD became administratively final in 1984. The Commission was not in place until January 1, 1985. There is no evidence in the record that the Commission did not consider these decisions to be final.

State argues the Commission was given jurisdiction over all claims which had not been included in a local government claims bill enacted before January 1, 1985. (Gov. Code, § 17630.) State is correct. However, the subject claim was included in such a bill, but the bill was signed into law after the recommended appropriation had been deleted. Under the statutory scheme, the only relief offered a disappointed claimant at such juncture is an action in declaratory relief to declare a subject executive order void

(former Rev. & Tax Code, § 2255, subd. (c); Stats. 1982, ch. 1638, § 7, pp. 6662-6663) or unenforceable (Gov. Code, § 17612, subd. (b); Stats. 1984, ch. 1459, § 1, p. 5121) and to enjoin its enforcement. LBUSD pursued this remedy and in addition petitioned for writ of mandate (Code Civ. Proc., § 1085) to compel reimbursement. There is no requirement to seek further administrative review. Indeed, to do so after the Legislature has spoken would appear to be an exercise in futility.

We conclude that Section 6 provides reimbursement to LBUSD because the Executive Order required a higher level of service and because the Executive Order constitutes a state mandate.

### B. Section 2234

As set forth in the procedural history of this case, the Board originally declined to consider the Claim as a claim made under section 2234 on the ground that it lacked jurisdiction to do so. LBUSD petitioned for judicial relief, and the trial court held that the Board had jurisdiction and must consider the claim on its merits. The Board did not appeal that decision. State raised the jurisdiction issue as an affirmative defense to the second petition for writ of mandate filed by LBUSD and presents it again for our consideration. Of course, lack of subject matter jurisdiction may be raised at any time. (*Stuck* v. *Board of Medical Examiners* (1949) 94 Cal.App.2d 751, 755 [211 P.2d 389].)

Former section 2250 provided: "The State Board of Control, pursuant to the provisions of this article, shall hear and decide upon a claim by a local agency or school district that such local agency or school district has not been reimbursed for *all costs mandated by the state as required by Section 2231 or 2234*. [¶] Notwithstanding any other provision of law, this article shall provide the sole and exclusive procedure by which the Board of Control shall hear and decide upon a claim that a local agency or school district has not been reimbursed for *all costs mandated by the state as required by Section 2231 or 2234*." (Italics added; Stats. 1978, ch. 794, § 5, p. 2549.) Given the clear, unambiguous language of the statute, there is no need for construction. (*West Covina Hospital* v. *Superior Court* (1986) 41 Cal.3d 846, 850 [226 Cal.Rptr. 132, 718 P.2d 119, 60 A.L.R.4th 1257].) We conclude that the Board had jurisdiction to consider a claim filed under former section 2234. However, as discussed below, the 1977 Executive Order falls outside the purview of section 2234.

Former section 2231 provided: "(a) . . . The state shall reimburse each school district only for those 'costs mandated by the state', as defined in

Section 2207.5." (Stats. 1982, ch. 1586, § 3, p. 6264.) In part, former section 2207.5 defines "costs mandated by the state" as increased costs which a school district is required to incur as a result of certain new programs or certain increased program levels or services mandated by an executive order issued *after* January 1, 1978. (Stats. 1980, ch. 1256, § 5, pp. 4248-4249.) As previously stated, the Executive Order in the case at bar was issued September 8, 1977.

Former section 2234, pursuant to which LBUSD initially filed its claim, does not itself contain language indicating a time limitation: "If a local agency or a school district, at its option, has been incurring costs which are subsequently mandated by the state, the state shall reimburse the local agency or school district for such costs incurred after the operative date of such mandate." (Stats. 1980, ch. 1256, § 11, p. 4251.)

State asserts that the January 1, 1978, limitation of sections 2231 and 2207.5 applies to section 2234, preventing reimbursement for costs expended pursuant to the September 8, 1977, Executive Order; LBUSD argues section 2234 is self-contained and without time limitation.

 It is a fundamental rule of statutory construction that a statute should be construed with reference to the whole system of law of which it is a part in order to ascertain the intent of the Legislature. (*Moore* v. *Panish* (1982) 32 Cal.3d 535, 541 [186 Cal.Rptr. 475, 652 P.2d 32]; *Pitman* v. *City of Oakland* (1988) 197 Cal.App.3d 1037, 1042 [243 Cal.Rptr. 306].) The legislative history of a statute may be considered in ascertaining legislative design. (*Walters* v. *Weed* (1988) 45 Cal.3d 1, 10 [246 Cal.Rptr. 5, 752 P.2d 443].)

The earliest version of section 2234 is found in former section 2164.3, subdivision (f), which provided reimbursement to a city, county, or special district for "a service or program [provided] at its option which is subsequently mandated by the state . . . ." Reimbursement was limited to costs mandated by statutes or executive orders enacted or issued after January 1, 1973. (Stats. 1972, ch. 1406, § 3, pp. 2962-2963.)

In 1973, section 2164.3 was amended to provide reimbursement to school districts for costs mandated by statutes enacted after January 1, 1973 (subd. (a)), *but it expressly excluded school districts from reimbursement for costs mandated by executive orders* (subd. (d)). (Stats. 1973, ch. 208, § 51, p. 565.) Later that same year, the Legislature repealed section 2164.3 (Stats. 1973, ch. 358, § 2, p. 779) and added section 2231, which took over the pertinent

reimbursement provisions of section 2164.3 virtually unchanged. (Stats. 1973, ch. 358, § 3, pp. 779, 783-784.)

In 1975, the Legislature removed the time limitation language from section 2231 and incorporated it into a new section, 2207. (Stats. 1975, ch. 486, § 1.8, pp. 997-998.) After this change, section 2231 then provided in pertinent part: "(a) The state shall reimburse each local agency for all 'costs mandated by the state', as defined in Section 2207. *The state shall reimburse each school district only for those 'costs mandated by the state' specified in subdivision (a) of Section 2207 . . . ."* (Italics added; Stats. 1975, ch. 486, § 7, pp. 999-1000.) Subdivision (a) of section 2207 limited reimbursement solely to costs mandated by statutes enacted after January 1, 1973.

At this same juncture, the Legislature further amended section 2231 by deleting the provision for "subsequently mandated" services or programs and incorporating that provision into a new section, 2234 (Stats. 1975, ch. 486, § 9, p. 1000), the section under which LBUSD would eventually make its claim. The substance of section 2234 (see fn. 2, *ante*) remained unchanged until its repeal in 1986. (Stats. 1977, ch. 1135, § 8.6, p. 3648; Stats. 1980, ch. 1256, § 11, pp. 4251-4252; Stats. 1986, ch. 879, § 25, p. 3045.)

Next, section 2231 was amended to show that with regard to school districts, "costs mandated by the state" were now defined by a new section, 2207.5. (Stats. 1977, ch. 1135, § 7, pp. 3647-3648.) Section 2207.5 limited reimbursement to costs mandated by statutes enacted after January 1, 1973, and *executive orders issued after January 1, 1978*. (Stats. 1977, ch. 1135, § 5, pp. 3646-3647.) (No further pertinent amendments to section 2231 occurred; see Stats. 1978, ch. 794, § 1.1, p. 2546; Stats. 1980, ch. 1256, § 8, pp. 4249-4250; Stats. 1982, ch. 734, § 3, p. 2912.) The distinction between statutes and executive orders was preserved when section 2207.5 was amended in 1980 (Stats. 1980, ch. 1256, § 5, pp. 4248-4249) and was in effect at the time of the Board hearing.

This survey teaches us that with respect to the reimbursement process, the Legislature has treated school districts differently than it has treated other local government entities. The Legislature initially did not give school districts the right to recover costs mandated by executive orders; and when this option was made available, the effective date differed from that applicable to other entities. The Legislature consistently limited reimbursement of costs by reference to the effective dates of statutes and executive orders and nothing indicates the state intended recovery of costs to be open-ended.

Because the "subsequently mandated" provision of section 2234 originally was contained in sections which set forth specific date limitations (former sections 2164.3 and 2231), we conclude the Legislature likewise intended to limit claims made pursuant to section 2234. The use of the language "subsequently mandated" merely describes an additional circumstance in which the state will reimburse costs, provided the claimant meets other requirements. Since the September 1977 Executive Order falls outside the January 1, 1978, limit set by section 2207.5, section 2234 does not provide for reimbursement to LBUSD.

## III. The Award

The full text of the award as provided by the judgment is set forth in an appendix to this opinion. In part, the judgment states that there are appropriated funds in budgets for the DOE, the Commission, the Reserve for Contingencies or Emergencies, and the Special Fund for Economic Uncertainties, "or similarly designated accounts" which are " 'reasonably available' " to reimburse LBUSD for the state mandated costs it has incurred. (Appendix, pars. 3, 2.) The State Controller is commanded to pay the claims plus interest "at the legal rate" from the described appropriations for fiscal years 1984-1985 through 1987-1988 and "subsequently enacted State Budget Acts." (Appendix, par. 7.) The judgment declares that the deletion of funding for reimbursement of costs incurred in compliance with the Executive Order was invalid and unconstitutional. (Appendix, par. 12.) Finally, the Fines and Forfeiture Funds in the custody of the Auditor-Controller of Los Angeles County are held to be not reasonably available for reimbursement. (Appendix, par. 5.)

### A. State Position

State contends the trial court's award is contrary to California law, asserting that it constitutes an invasion of the province of the Legislature and therefore a judicial usurpation of the republican form of government guaranteed by the United States Constitution, Article IV, section 4.

A court cannot compel the Legislature either to appropriate funds or to pay funds not yet appropriated. (Cal. Const., art. III, § 3; art. XVI, § 7; *Mandel* v. *Myers* (1981) 29 Cal.3d 531, 540 [174 Cal.Rptr. 841, 629 P.2d 935]; *Carmel Valley Fire Protection Dist.* v. *State of California, supra*, 190 Cal.App.3d at p. 538.) However, no violation of the separation of powers doctrine occurs when a court orders appropriate expenditures from already existing funds. (*Mandel*, at p. 540; *Carmel Valley*, at pp. 539-540.) The test is whether such funds are "reasonably available for the

expenditures in question . . . ." (*Mandel*, at p. 542; *Carmel Valley*, at pp. 540-541.) Funds are "reasonably available" for reimbursement when the purposes for which those funds were appropriated are "generally related to the nature of costs incurred . . . ." (*Carmel Valley*, at p. 541.) There is no requirement that the appropriation specifically refer to the particular expenditure (*Mandel* at pp. 543-544, *Carmel Valley* at pp. 540; *Committee to Defend Reproductive Rights* v. *Cory* (1982) 132 Cal.App.3d 852, 857-858 [183 Cal.Rptr. 475]), nor must past administrative practice sanction coverage from a particular fund (*Carmel Valley*, at p. 540).

As previously stated, the trial court found the subject funds were "reasonably available." No party requested a statement of decision, and therefore it is implied that the trial court found all facts necessary to support its judgment. (*Michael U.* v. *Jamie B.* (1985) 39 Cal.3d 787, 792-793 [218 Cal.Rptr. 39, 705 P.2d 362]; *Homestead Supplies, Inc.* v. *Executive Life Ins. Co.* (1978) 81 Cal.App.3d 978, 984 [147 Cal.Rptr. 22].) We now examine the record to ascertain whether substantial evidence supports the decision of the trial court.

The Board having approved reimbursement under the Executive Order, reported to the Legislature that "[t]he categories of reimbursable costs include, but are not limited to: (1) voluntary pupil assignment or reassignment programs, (2) magnet schools or centers, (3) transportation of pupils to alternative schools or programs, (5) [*sic*, no item (4)] racially isolated minority schools, (6) costs of planning, recruiting, administration and/or evaluation, and (7) overhead costs." The guidelines set out comprehensive steps to be taken by school districts in order to be in compliance with the Executive Order.

The peremptory writ of mandate, issued the same date as the judgment, designated funds in specific account numbers and, in addition, a special fund as available for reimbursement. We take judicial notice of the relevant budget enactments and Government Code sections 16418 and 16419 (Evid. Code, §§ 459, subd. (a), 452) and address these designations seriatim.

The line item account numbers for the DOE for fiscal years 1984-1985 through 1987-1988 set forth in the writ are as follows: 6100-001-001, 6100-001-178, 6100-015-001, 6100-101-001, 6100-114-001, 6100-115-001, 6100-121-001, 6100-156-001, 6100-171-178, 6100-206-001, 6100-226-001.

An examination of the relevant budget acts Statutes 1985, chapter 111; Statutes 1986, chapter 186; Statutes 1987, chapter 135; and final budgetary changes as published by the Department of Finance for each year, shows

that appropriations in the 11 DOE line item account numbers have supported a very broad range of activities including reimbursement of costs for both mandated and voluntary integration programs, assessment programs, child nutrition, meals for needy pupils, participation in educational commissions, administration costs of various programs, proposal review, teacher recruitment, analysis of cost data, school bus driver instructor training, shipping costs for instructional materials, local assistance for school district transportation aid, summer school programs, local assistance to districts with high concentrations of limited- and non-English-speaking children, adult education, driver training, Urban Impact Aid, and cost of living increases for specific programs. Further evidence regarding the uses of these funds is found in the deposition testimony of William C. Pieper, Deputy Superintendent for Administration with the State Department of Education, who stated that local school districts were being reimbursed for the costs of desegregation programs from line item account numbers 6100-114-001 and 6100-115-001 in the 1986 State Budget Act.

Comparing the requirements of the Executive Order and guidelines with the broad range of activities supported by the DOE budget, we conclude that the subject funds, although not specifically appropriated for the reimbursement in question, were generally related to the nature of the costs incurred.

With regard to the Commission, the writ sets out three line item account numbers: 8885-001-001; 8885-101-001; and 8885-101-214. A review of the relevant budget acts shows that the first line item provides funding for support of the Commission, and line item number 8885-101-001 provides funding specifically for local assistance "in accordance with the provisions of Section 6 of Article XIII B of the California Constitution . . . ." (Stats. 1986, ch. 186.) Line item number 8885-101-214 also provides funds for "local assistance." Since the Commission was created specifically to effect reimbursements for qualifying claims, we conclude there is a general relationship between the purpose of the appropriations and the requirements of the Executive Order.

Line item 9840-001-001 of the Reserve for Contingencies or Emergencies defines "contingencies" as "proposed expenditures arising from unexpected conditions or losses for which no appropriation, or insufficient appropriation, has been made by law and which, in the judgment of the Director of Finance, constitute cases of actual necessity." (All relevant budget acts.) In the instant case, previous to the issuance of the Executive Order, LBUSD could not have anticipated the expenditures necessary to bring it into compliance. Further, the Legislature refused to appropriate the necessary funds

to directly reimburse the district for these expenditures. The necessity exists by virtue of the writ and judgment issued by the trial court. Therefore, this line item, and three others which also support the reserve (9840-001-494, 9840-001-988, 9840-011-001) are generally related to the costs.[16]

Finally the writ lists as sources of reimbursement the Special Fund for Economic Uncertainties "or similarly designated accounts . . . ." An examination of Government Code sections 16418 and 16419 relating to the special fund shows only one use of this reserve: establishment of the Disaster Relief Fund "for purposes of funding disbursements made for response to and recovery from the earthquake, aftershocks, and any other related casualty." No evidence in the record indicates a general relationship between this purpose and the costs incurred by LBUSD. We conclude, therefore, that this source of funding cannot be used for reimbursement. This source is stricken from the judgment.

The description of further sources of funding as "similarly designated accounts" fails to sufficiently identify these sources and we therefore strike this part of the judgment.

In a supplemental brief, LBUSD requests this court to take judicial notice of the Budget Acts of 1988-1989 (Stats. 1988, ch. 313) and 1989-1990 (Stats. 1989, ch. 93) pursuant to the Evidence Code (Evid. Code, §§ 451, subd. (a), 452, subd. (a), 452, subd. (c), 459) and to order that the amounts set forth in the judgment and writ be satisfied from specific line item accounts in these later budgets and from the Special Fund for Economic Uncertainties.[17]

██ "An appellate court is empowered to add a directive that the trial court order be modified to include charging orders against funds appropriated by subsequent budget acts. [Citation.]" (*Carmel Valley, supra*, 190 Cal.App.3d at p. 557.) ██ We have reviewed the designated budget acts and conclude that the specified line item accounts for DOE, the Com-

---

[16] The costs do not come within past or current definitions of "emergency," which are, respectively, as follows. "[P]roposed expenditures arising from unexpected conditions or losses for which no appropriation, or insufficient appropriation, has been made by law and which in the judgment of the Director of Finance require immediate action to avert undesirable consequences or to preserve the public peace, health or safety." (Fiscal years 1984-1985, 1985-1986.) "[E]xpenditure incurred in response to conditions of disaster or extreme peril which threaten the health or safety of persons or property within the state." (Fiscal years 1986-1987 forward.)

[17] LBUSD identifies the line items accounts as follows: DOE—6110-001-001, 6110-001-178, 6110-015-001, 6110-101-001, 6110-114-001, 6110-115-001, 6110-121-001, 6110-156-001, 6110-171-178, 6110-226-001, 6110-230-001; Commission—8885-001-001, 8885-101-001, 8885-101-214; Reserve for Contingencies or Emergencies—9840-001-001, 9840-001-494, 9840-001-988, 9840-011-001.

mission, and the Reserve for Contingencies and Emergencies provide funds for a broad range of activities similar to those set out above and therefore are generally related to the nature of the costs incurred. However, for the reasons previously discussed, we decline to designate the Special Fund for Economic Uncertainties as a source for reimbursement.

While we have concluded that certain line item accounts are generally related to the nature of the costs incurred, there must also be evidence that at the time of the order the enumerated budget items contained sufficient funds to cover the award. (Gov. Code, § 12440; *Mandel* v. *Myers, supra*, 29 Cal.3d at p. 543; *Carmel Valley, supra*, 190 Cal.App.3d at p. 541; cf. *Baggett* v. *Dunn* (1886) 69 Cal. 75, 78 [10 P. 125]; *Marshall* v. *Dunn* (1886) 69 Cal. 223, 225 [10 P. 399].) The record before us contains evidence regarding balances at various points in time for some of the line item accounts, but that evidence is primarily in the form of uninterpreted statistical data. We have not found a clear statement which would satisfy this requirement. Furthermore, not every line item was in existence every fiscal year. In addition, those which entered the budgetary process did not always survive it unscathed. Therefore, we remand the matter to the trial court to determine with regard to the line item account numbers approved above whether funds sufficient to satisfy the award were available at the time of the order. (Cf. *County of Sacramento* v. *Loeb* (1984) 160 Cal.App.3d 446, 454-455 [206 Cal.Rptr. 626].) If the trial court determines that the unexhausted funds remaining in the specified appropriations are insufficient, the trial court order can be further amended to reach subsequent appropriated funds. (*County of Sacramento* at p. 457; *Serrano* v. *Priest* (1982) 131 Cal.App.3d 188, 198 [182 Cal.Rptr. 387].)

■ Having concluded that certain appropriations are generally available to reimburse LBUSD, we turn to an additional issue raised by State: that the "finding" by the Legislature that the Executive Order does not impose a "state-mandated local program" prevents reimbursement.

Unsupported legislative disclaimers are insufficient to defeat reimbursement. (*Carmel Valley, supra*, 190 Cal.App.3d at pp. 541-544.) As discussed, LBUSD, pursuant to Section 6, has a constitutional right to reimbursement of its costs in providing an increased service mandated by the state. The Legislature cannot limit a constitutional right. (*Hale* v. *Bohannon* (1952) 38 Cal.2d 458, 471 [241 P.2d 4].)

### B. DOE Contentions

DOE is sympathetic to LBUSD's position. On appeal, it takes no stand on the issue whether the Executive Order constitutes a state mandate within

the meaning of Section 6. ■■■ The thrust of its appeal is that, if there is a mandate, the DOE budget is an inappropriate source of funding in comparison with other budget line item accounts included in the order.

We conclude to the contrary because logic dictates that DOE funding be the initial and primary source for reimbursement. As discussed, the test set forth in *Mandel* and *Carmel Valley* is whether there is a general relationship between budget items and reimbursable expenditures. Since the Executive Order was issued by DOE, it is not surprising that the evidence overwhelmingly supports the finding of the trial court that this general relationship exists with regard to the DOE budget.

While we also have concluded that certain line item accounts for entities other than DOE are also appropriate sources of funding, the record does not provide the statistical data necessary to determine how far the order will reach with regard to these additional sources of support.

DOE also contends that reimbursement for expenditures in fiscal years 1977-1978, 1978-1979, and 1979-1980 cannot be awarded under Section 6 because the amendment was not effective until July 1, 1980. As discussed, this argument has been previously rejected. (*Carmel Valley Fire Protection Dist.* v. *State of California, supra,* 190 Cal.App.3d at pp. 547-548; *City of Sacramento* v. *State of California, supra,* 156 Cal.App.3d 182, 191-194, disapproved on other grounds in *County of Los Angeles* v. *State of California, supra,* 43 Cal.3d 46, 58, fn. 10.)

■■■ Finally, DOE contends that interest should have been awarded at the rate of 6 percent per annum pursuant to Government Code section 926.10 rather than at the legal rate provided under article XV, section 1, paragraph (2) of the California Constitution.

Government Code section 926.10 is part of the California Tort Claims Act (Gov. Code, § 900 et seq.) which provides a statutory scheme for the filing of claims against public entities for alleged injuries; it makes no provision for claims for reimbursement for state mandated expenditures. In *Carmel Valley* a judgment awarding interest at the legal rate was affirmed. (*Carmel Valley Fire Protection Dist.* v. *State of California, supra,* 190 Cal.App.3d at p. 553.) We decline the invitation of DOE to apply another rule.

### C. Cross Appeal of LBUSD

■■■ LBUSD seeks reversal of that part of the judgment holding. that monies in the Fines and Forfeitures Funds in the custody and possession of

cross-respondent Auditor-Controller of the County of Los Angeles (County Controller) for transfer to the state treasury are not reasonably available for reimbursement of its state mandated expenditures.[18]

As previously stated, funds are "reasonably available" when the purposes for which those funds were appropriated are generally related to the nature of the costs incurred. (*Carmel Valley, supra*, 190 Cal.App.3d at pp. 540-541.) LBUSD does not cite, nor have we found, any evidence in the record showing the use of those funds once they are transmitted to the state and that those funds are then "reasonably available" to satisfy the Claim. We cannot conclude as a matter of law that a general relationship exists between those funds and the nature of the costs incurred pursuant to the Executive Order. LBUSD has failed to carry its burden of proof and the trial court correctly decided these funds were not "reasonably available" for reimbursement.

Nor have we concluded that there is any ground on which the funds could be made available to LBUSD while in the possession of the county Auditor-Controller. The instant case differs from *Carmel Valley* wherein we affirmed an order which authorized a county to satisfy its claims against the state by offsetting fines and forfeitures it held which were due the state. The *Carmel Valley, supra*, 190 Cal.App.3d 521, holding was based on the right of offset as "a long-established principle of equity." (*Id.* at p. 550.) That is a different standard than the standard of "generally related to the nature of costs incurred." In the case at bar there is no set-off relationship between county and LBUSD.

## DISPOSITION

We conclude that because the doctrines of collateral estoppel and waiver are inapplicable to the facts of this case, the trial court should have allowed State to challenge the decisions of the Board. However, we also determine, as a question of law, that the Executive Order requires local school boards to provide a higher level of service than is required constitutionally or by case law and that the Executive Order is a reimbursable state mandate pursuant to article XIII B, section 6 of the California Constitution. Former Revenue and Tax Code section 2234 does not provide reimbursement of the subject claim.

---

[18] In its first amended petition, LBUSD listed the following code sections as appropriate sources of reimbursement: "Penal Code Sections 1463.02, 1463.03, 1403.5A and 1464; Government Code Sections 13967, 26822.3 and 72056; Health and Safety Code Section 11502; and Vehicle Code Sections 1660.7, 42003, and 41103.5."

Based on uncontradicted evidence, we modify the decision of the trial court by striking as sources of reimbursement the Special Fund for Economic Uncertainties "or similarly designated accounts." We also modify the judgment to include charging orders against certain funds appropriated through subsequent budget acts.

We affirm the decision of the trial court that the Fines and Forfeitures Funds are not "reasonably available" to satisfy the Claim.

Finally, we remand the matter to the trial court to determine whether at the time of its order, unexpended, unencumbered funds sufficient to satisfy the judgment remained in the approved budget line item account numbers. The trial court is also directed to determine this same issue with respect to the charging order.

The judgment is affirmed as modified. Each party is to bear its own costs on appeal.

Ashby, J., and Boren, J., concurred.

Appellants' petitions for review by the Supreme Court were denied February 28, 1991. Lucas, C. J., did not participate therein.

APPENDIX

The superior court judgment provides in pertinent part: "IT IS ORDERED, ADJUDGED AND DECREED THAT: "1. The requirements contained in Title 5, California Administrative Code, Sections 90-101 constitute a reimbursable State-mandate which cannot be challenged by State Respondents or Respondent DOE because of the doctrines of administrative collateral estoppel and waiver.

"2. There are appropriated funds from specified line items in the 1984, 1985, 1986 and 1987 budgets which are 'reasonably available' to reimburse Petitioner for State-mandated costs it has occurred [*sic*] as a result of its compliance with the requirements of Title 5, California Administrative Code, Sections 90-101.

"3. The funds appropriated by the Legislature for:

"(a) the support of the Department of Education, including, but not limited, to the Department's General Fund;

"(b) the Commission on State Mandates, including, but not limited to the State Mandates Claim Fund; and

"(c) the 'Reserve for Contingencies or Emergencies', 'Special Fund for Economic Uncertainties' or similarly designated accounts, are 'reasonably available' and may properly be and should be encumbered and expended for the reimbursement of State-mandated costs in the amount of $28,014,869.00, plus applicable interest, as incurred by Petitioner and as computed by Petitioner in compliance with Parameters and Guidelines adopted by the State Board of Control.

"4. The law in effect at the time that Petitioner's claim was processed provided for the computation of a specific claim amount for specific fiscal years based on Parameters and Guidelines, or claiming instructions, adopted in April 1984 and a Statewide Cost Estimate adopted on August 23, 1984, both of which are administrative actions of the State Board of Control which have not been challenged by State Respondents. The computations made pursuant to the Parameters and Guidelines and Statewide Cost Estimate are specific and ascertainable and subject to audit by the State Controller under Government Code section 17558.

"5. The Court decrees that State funds entitled the 'Fines and Forfeitures Funds' under the custody and control of Respondent Bloodgood, are not reasonably available for satisfaction of Petitioner's claim for reimbursement of State-mandated costs.

"6. A peremptory writ of mandamus shall issue under the seal of this Court, commanding State Respondents and Respondent Doe to comply with Article XIIIB, Section 6 of the California Constitution and Government Code Section 17565 and reimburse petitioner for:

"(a) State-mandated costs in the amount of $24,164,593.00, incurred as a result of its compliance with the requirements of Title 5, California Administrative Code, Sections 90-101 during fiscal years 1977-78 through 1982-1983, plus interest at the legal rate from September 28, 1985; and

"(b) State-mandated costs in the amount of $3,850,276.00, incurred as a result of Petitioner's compliance with the requirements of Title 5, California Administrative Code, Sections 90-101 during fiscal years 1983-84 and 1984-85, plus interest at the legal rate from September 28, 1985.

"7. Said peremptory writ shall command Respondent Gray Davis, State Controller, or his successor-in-interest, to pay the claims of Petitioner, plus interest at the legal rate from

September 28, 1985 from the appropriations in the State Budget Acts for the 1984-85, 1985-86, 1986-87 and 1987-88 fiscal years, and the subsequently enacted State Budget Acts, which include, or will include appropriations for:

"(a) the support of the Department of Education, including, but not limited to the Department's General Fund;

"(b) the Commission on State Mandates, including, but not limited to the State Mandates Claim Fund; and

"(c) the 'Reserve for Contingencies or Emergencies', Special Fund for Economic Uncertainties' or similarly designated accounts, which are 'reasonably available' to be encumbered and expended for the reimbursement of State-mandated costs incurred by Petitioner and further shall compel Elizabeth Whitney, Acting State Treasurer, or her successor-in-interest, to make payments on the warrants drawn by Respondent Gray Davis, State Controller upon their presentation for payment by Petitioner without offset or attempt to offset against other monies due and owing Petitioner until Petitioner is reimbursed for all such costs.

"8. Said Peremptory Writ of Mandate also shall command Respondent Jesse R. Huff, Director of the State Department of Finance, to perform such actions as may be necessary to effect reimbursement required by other portions of this Judgment, including but not limited to, those actions specified in Chapter 135, Statutes of 1987, Section 2.00, pp. 549-553, or with respect to the Special Fund for Economic Uncertainties.

"9. Pending the final disposition of this proceeding, State Respondents and Respondent DOE, and each of them, their successors in office, agents, servants and employees and all persons acting in concert or participation with them, are hereby enjoined or restrained from directly or indirectly expending from the appropriations described in Paragraph No. 7 hereinabove any sums greater than that which would leave in said appropriations at the conclusion of the respective fiscal years an amount less than the reimbursement amounts claimed by Petitioner together with interest at the legal rate through payment of said reimbursement amount. Said amounts are hereinafter referred to collectively as the 'reimbursement award sum'.

"10. Pending the final disposition of this proceeding State Respondents and Respondent DOE, and each of them, their successors in office, agents, servants and employees, and all persons acting in concert or participation with them, are hereby enjoined and restrained from directly or indirectly causing to revert the reimbursement award sum from the appropriations described in Paragraph No. 7 hereinabove to the general funds of the State of California and from otherwise dissipating the reimbursement award sum in a manner that would make it unavailable to satisfy this Court's judgment.

"11. The State Respondents and Respondent Doe have a continuing obligation to reimburse Petitioner for costs incurred in compliance with the requirements contained in Title 5, California Administrative Code, Section 90-101 in the fiscal years subsequent to it's [*sic*] claims for expenditures in fiscal years 1977-78 through 1984-85 as set forth in the First Amended Petition, as amended, and the accompanying Motion For the Issuance Of A Writ Of Mandate.

"12. The deletion of funding for reimbursement of State-mandated costs incurred in compliance with Title 5, California Administrative Code, Sections 90-101 from Chapter 1175, Statutes of 1985 was invalid and unconstitutional.

"13. Respondent Gray Davis, State Controller, shall retain the right to audit the claims and records of the Petitioner pursuant to Government Code Section 17561(d) to verify the actual dollar amount of the reimbursement award sum.

"14. The Court reserves and retains jurisdiction to effect any appropriate remedy at law or equity which may be necessary to enforce its judgment or order.

"15. Petitioner shall recover from State Respondents and Respondent DOE costs in this proceeding in the amount of 1,863.54.

"Dated: 3-2, 1988 "/s/ Weil
 "Robert I. Weil
 "Judge of The Superior Court"